ALBERT H. LEHMAN v. DWYER PLUMBING & HEATING COMPANY.[1]

May 8, 1908.

Nos. 15,598—(44).

**Personal Injury—Evidence.**

> A jury cannot be allowed to speculate or conjecture, or draw inferences, unless there is some reasonable basis therefor in the evidence. Applying this rule in an action to recover damages for personal injuries, it is held that the evidence does not justify the inference that the defendant was negligent as alleged.

Action in the district court for Ramsey county to recover $11,550 damages for personal injuries. The case was tried before Bunn, J., and a jury which rendered a verdict for $4,000 in favor of plaintiff. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Reversed and new trial granted.

*Keith, Evans, Thompson & Fairchild,* for appellant.

*Frederick N. Dickson* and *Herbert P. Keller,* for respondent.

ELLIOTT, J.

This is an appeal from an order denying the defendant's motion for judgment notwithstanding the verdict or for a new trial. The injuries to the respondent are alleged to have been occasioned by the negligence of the defendant in furnishing him with a defective plumber's furnace. On October 4, 1905, the respondent, Lehman, was employed as a journeyman plumber by the appellant, the Dwyer Plumbing & Heating Company, upon a building in process of construction in the city of St. Paul. He was assisted in his work by a helper named Wheeler, who was also in the employ of the appellant company. On that day Lehman was using a plumber's furnace which proved defective, and he instructed Wheeler to turn it into the shop and to get a good furnace. The furnaces belonging to the appellant and furnished by it to its employees were kept in a toolroom in the care and custody of one Moncrief, its stock clerk, whose duty it

[1] Reported in 116 N. W. 352.

was to take charge of all the furnaces, see that they were kept in proper repair, and give them to appellant's operatives when required for use in their work. Moncrief had exclusive charge of this toolroom. His instructions required him to keep the toolroom locked and inaccessible to other employees; but it appears that the men were at liberty to go into this room with him and select a particular furnace, if any desired. It was the duty of the stock clerk to see that all furnaces in good repair were kept in the toolroom, and those that were defective and in need of repair in an outside room. Only furnaces supposed to be in good repair were kept in the toolroom. On the evening of October 4, Wheeler returned the defective furnace to the stock clerk, and asked for a good one, and was told by the clerk to call the next morning and get another furnace. When he called on the following morning, Moncrief took the key from his pocket, unlocked the toolroom door, brought out a plumber's furnace, shook it to see if there was gasolene in it, and gave it to Wheeler, with instructions to take it downstairs and fill it with gasolene. Wheeler did so, and then took it to the building where he and Lehman were working. Not having any immediate use for the furnace, he placed it in the basement of the building, where it remained until about half-past four in the afternoon. About that time it became necessary to melt a certain hub or joint, and Lehman directed Wheeler to light the furnace and apply it to the joint in question. This Wheeler did, and then sat down to watch the progress of the melting, while Lehman went to get the plans of the building. Lehman did not examine the furnace, further than to observe that it was not the one which had been in use on the previous day. Upon Lehman's return he told Wheeler to get out of the way, in order that he might inspect the condition of the joint which was being melted. Just as he kneeled down for that purpose, flames burst out from the region of the air cock in the furnace and ignited his clothes, with the result that he was severely burnt. During the confusion which followed some one threw the furnace out of the window, and it was not seen again until it was found by Wheeler on the following morning.

This furnace was so constructed that compressed air and gasolene were combined to produce a flame. It consisted of a reservoir of about one gallon capacity, at one side of which was a cock valve con-

nected with a rubber bulb.   On the top of the reservoir there· was a small perpendicular metal tube, which ran up through a coil to a burner.   In this tube there was another cock valve, which regulated the flow and supply of gasolene to the burner.   To use this furnace, after supplying the reservoir with gasolene, it was necessary to open the cock valve at the side of the reservoir, and by means of a rubber bulb pump air into the reservoir with the gasolene.   When a sufficient quantity of air to produce the desired pressure had been pumped into the reservoir, the cock valve (or air cock) in the passage connecting the bulb with the reservoir was then closed, and the other cock valve (the oil cock) in the tube leading to the burner was opened sufficiently to allow gasolene in the requisite amount to be forced, by the operation of the compressed air in the reservoir, through the tube and coil to the burner.   When the furnace was in operation with the flame burning, it was necessary that the cock valve controlling the passage from the air bulb to the reservoir should be kept tightly closed, in order to prevent the escape of gas.   It is conceded that, while this furnace was being operated, gasolene escaped out of the reservoir through the air valve, and, coming in contact with the flame of the burner, ignited and set fire to the respondent's clothes.

The case of the plaintiff rested upon his ability to prove that the air valve, or, as it is called in the evidence, the "pet cock," was defective at the time of the accident and at the time when it was delivered to Wheeler by the stock clerk.   The complaint alleges that the negligence of the defendant consisted in furnishing and supplying "to this plaintiff a certain gasolene furnace of the general type above described, for his use on said work, which was in an advanced state of nonrepair, worn out, defective, dirty, clogged, unfit and unsafe for use under the circumstances."   It is also alleged that this "unrepaired, worn, defective, dirty, clogged, unfit and unsafe condition was not patent to casual examination, and could not be discovered by an ordinary inspection or examination."   Stripped of its verbiage, the complaint charges the defendant with negligently furnishing the plaintiff with a plumber's furnace which was in a defective condition, which condition was not discoverable by ordinary examination.   It was the duty of the employer to use reasonable care to see that the employee was furnished with a reasonably safe furnace.   This fur-

nace was defective, and the defendant negligent, if the pet cock was in such a condition that it was liable to become loose without adequate cause in the progress of the work, and such condition was known to the stock clerk, Moncrief, or could have been known to him by proper inspection, before or at the time when he delivered the furnace to Wheeler. The record thus presents two questions: (1) Was the pet cock in a defective condition at the time of the accident? and, if so, (2) was that fact known, or should it have been known, by Moncrief when he delivered the furnace to Wheeler? These are both questions of fact to be answered by the evidence. Answering the first in the negative renders the other question immaterial.

The burden rested upon the plaintiff to prove that the pet cock was defective and that the defect caused the explosion. He was not bound to prove this by direct evidence, yet he was required to produce evidence which furnished a reasonable basis for the conclusion to which he desired the court and the jury to arrive. A verdict cannot rest upon mere probabilities, conjecture, and speculation. There must be some facts or circumstances in the evidence from which it may reasonably be inferred that the defendant was negligent as charged. The jury cannot be allowed to speculate, or conjecture, or draw inferences, unless there is some reasonable basis therefor in the evidence. There must be something in the evidence which renders that conclusion of negligence more reasonable than any other conclusion which would be consistent with the absence of negligence on the part of the defendant. Koslowski v. Thayer, 66 Minn. 150, 68 N. W. 973; Minneapolis Sash & Door Co. v. Great Northern Ry. Co., 83 Minn. 370, 86 N. W. 451; Truax v. Minneapolis, St. P. & S. S. M. Ry. Co., 89 Minn. 143, 94 N. W. 440; Ulseth v. Crookston Lumber Co., 97 Minn. 178, 106 N. W. 307.

Tested by these principles, we are satisfied that the evidence in this record is entirely insufficient to warrant the conclusion that the pet cock was defective. The doctrine of "res ipsa loquitur" is not applicable upon the conceded facts. Where an instrument is under the exclusive control of the defendant, and is of such a character that the accident could not have happened if the instrument had been in good condition, the fact that the accident occurred has sufficient probative force to make a prima facie case of negligence. But where the instrument was

104 M.—13

not under the exclusive control of the defendant, and the accident may have occurred by reason of causes other than a defect, the mere fact of the accident has no tendency whatever to prove that the instrument was defective. This furnace was taken from the room where only furnaces which were supposed to be in good repair were kept. It was given to Wheeler, who took it to the building where the work was being done, and was by him left in the basement for a number of hours. When it was needed, Wheeler opened the pet cock, pumped the air in, and then closed the cock. It is reasonable to infer that he would have observed the condition of the pet cock if it had then been in the condition in which he says it was when he found it the morning after the fire.

There is nothing in the evidence which even tends to prove that the pet cock was out of order at the time of the accident, unless it is the fact that the accident occurred. The furnace had been in the possession of Wheeler, or in the basement of the building where he left it, during the greater part of the day. In the absence of any showing to the contrary, the fact that it was taken from the room where only furnaces in good repair were supposed to be kept has some probative value. An examination was made by Moncrief to see whether the reservoir contained gasolene. Wheeler handled the pet cock when he prepared the furnace for work, without discovering any defects. The explosion, which must have been a severe one, may have had some effect upon the valve. The furnace was thrown from a building through a window, and struck upon the ground, where it remained until the morning after the fire. Wheeler testified that when he found it there the next morning the valve was very loose and "wobbly," and could be opened by striking upon the side of the reservoir. It was thus defective at that time. But this fact is entirely insufficient to justify the inference that it was in that condition before the accident occurred. The fact that gasolene escaped through the pet cock does not justify the conclusion that the mechanism was defective. If a bar of iron breaks under ordinary and proper usage, the fact of the breaking tends to prove that the bar was defective. If the body of this reservoir had broken, it might have been evidence that it was not constructed of proper material. But the fact that gas escaped does not prove that the pet cock was defective. It merely proves that the valve was open. Its being open did not prove that it was defective.

It might have been opened intentionally or accidentally. It may have been left slightly open by Wheeler, so that the gas escaped so gradually that the volume was not sufficient to reach the flames for some time. The burst of flame would have followed the opening of the cock, however, and by whomsoever it was turned. There was nothing to show how the cock was opened, and the jurors were left to speculate and conjecture, without anything to guide them to a proper conclusion.

The order of the trial court is therefore reversed, and a new trial granted.