OLE OLSON v. WILLARD C. PIKE and Another.[1]

March 26, 1909.

Nos. 15,998—(207).

**Questions for Jury.**

In a personal injury action, it is *held* that the evidence was sufficient to take the case to the jury on the issues of the defendant's negligence, the contributory negligence of the plaintiff, whether a certain foreman was a vice principal, and whether the plaintiff assumed the risk, and to sustain the verdict.

**Jury not Influenced by Prejudice.**

The amount of the verdict was not so excessive as to show that the jury was influenced by passion and prejudice.

Action in the district court for Hennepin county to recover $10,000 for personal injuries caused by a fall from a staging used in whitewashing the ceiling of the live stock "amphitheatre" at the State Fair Grounds. The case was tried before Simpson, J., and a jury which re-

[1] Reported in 120 N. W. 378.

turned a verdict in favor of plaintiff for $6,000. From an order denying their motion for judgment notwithstanding the verdict or for a new trial, defendants appealed. Affirmed.

*A. B. Jackson,* for appellants.

*Lars M. Rand, Arthur M. Higgins,* and *Norton M. Cross,* for respondent.


ELLIOTT, J.

The respondent, Ole Olson, while in the employ of the appellants, Pike & Cook, fell from a scaffold, on which he was working, and was injured. In an action against his employers, he recovered a verdict for $6,000. This appeal is from an order denying the motion for judgment for the defendant notwithstanding the verdict or for a new trial.

The evidence showed, or tended to show, that in June, 1906, Pike & Cook were engaged in the construction of a building, known as the "Live Stock Amphitheatre" on the State Fair Grounds. In order to whitewash the ceilings, it was necessary to construct a staging and suspend it from the iron rafters of the building. It is difficult, without reproducing the diagrams and photographs, which are in evidence, to convey a clear idea of the manner in which this staging was constructed and suspended. It will be sufficient, for an understanding of the questions presented on this appeal, to say that the stage consisted of a wooden beam, about six inches square and twenty five feet long, the ends of which rested in iron hooks, which were attached to ropes, which were placed over and around the iron rafters. A plank about ten inches in width was laid from this wooden beam to a parallel iron beam, and on this plank the workmen stood while whitewashing the ceiling overhead. The iron rafter, around which the rope, which connected with the hook, was tied, ran from the outside wall of the building at an angle of about fifteen degrees, and it is claimed that the rope slipped on this inclined iron rafter, thus giving the staging a downward motion, which caused the man who was working on it to lose his balance and fall.

It was charged that the defendant was negligent in failing to provide the workmen with a reasonably safe place in which to work, to furnish reasonably safe and suitable appliances and material for making, erecting, and suspending the scaffold, and particularly in failing to furnish

iron chains for supporting or suspending the staging. Stated in another form, the charge was that the rope furnished and used for suspending the staging from the slanting iron rafter was defective in quality, that a rope of any quality was unsafe for the purpose, because it had a tendency to slip on the rafter, and that a chain, and not a rope, should have been used.

The evidence tended to show that, after the staging was constructed, Olson objected to working on it, because in his opinion it was unsafe, and asked that it be suspended with chains, instead of ropes. This request was made of the defendant's foreman, and Olson testified that he went to work upon the scaffold, and continued until the time of the accident in reliance upon the statement of the foreman that he had telephoned to town for chains, and the promise that they would be used, instead of the ropes, as soon as they arrived.

The case was submitted to the jury on the theory that the negligence alleged was in failing to furnish safe and suitable ropes for the purpose. After stating the general duty which rests upon an employer to use reasonable care and to furnish reasonably safe appliances and material, the court instructed the jury that: "Under that general rule, the specific question is presented for your consideration whether or not the defendants, in furnishing the rope for use in erecting the stagings upon which this plaintiff did his work, exercised reasonable care to furnish reasonably safe and proper material for that purpose. If the defendants did exercise reasonable care in the furnishing of proper material for the use of the employees in erecting these stagings, and there was proper material there, suitable for such use of the employees, then the defendants would not be liable, even though the employees, engaged in erecting these stagings, selected out of the materials so furnished unsuitable or defective ropes. * * * You will determine * * * whether the ropes furnished were reasonably suitable or safe for such use, and, if not, whether the defendants were negligent in furnishing such ropes."

The jury were also instructed that: "The agreement claimed to have been made by the plaintiff that the defendants should furnish chains instead of ropes, even if you find such agreement was made, would not make it the duty of the defendants to furnish chains, provided the ropes they did furnish were reasonably safe and suitable for the pur-

pose of erecting the staging. * * * The understanding that chains were to be used would not bind defendants to furnish chains in lieu of ropes, if under the evidence ropes furnished were reasonably safe and suitable for the purpose. * * * The question here involved is whether the defendants failed to exercise proper care in furnishing these ropes, and whether the rope furnished and used in this staging, from which plaintiff fell, was insufficient for that purpose. * * * Before the defendants can be held liable, it must appear, as stated, that the defendants furnished, negligently, unsuitable rope for use in erecting these stagings, and that through such negligence a defective and unsuitable rope was furnished and used on the particular staging from which plaintiff fell, and that by reason of such defective and insufficient rope, so used, the plaintiff was caused to fall. If the defendants were negligent, as claimed, and such negligence was the approximate cause of the injury, then it would not affect the plaintiff's right of recovery even though the evidence discloses that one or more of the fellow servants were also negligent in such a manner as also to contribute to cause the injury."

The defendants' claims that the evidence did not show that the rope at the west end of the beam slipped or gave way, or was insufficient, or that the swinging beam dropped any distance because of the insufficiency of the rope, or for any other reason, were all submitted to the jury under specific instructions.

1. The appellants now contend that judgment notwithstanding the verdict should have been ordered because (a) the evidence wholly failed to establish the negligence alleged as the approximate cause of the injury; that (b) the evidence showed conclusively that the respondent voluntarily assumed whatever risks the condition involved; and (c) that the foreman, Levere, to whom Olson claims to have made his complaint, and from whom he received the promise to procure chains, was not a vice principal. It is apparent that the complaint was not drawn on the theory that the defendants would have been negligent if they had furnished safe and suitable ropes; that is, the objection was not to ropes, but to the particular quality of ropes furnished and used. The conversation between Olson and the foreman, Levere, about the use of chains, had some tendency to show that the parties recognized the fact that the rope in question was unsafe; but its only real importance is in

connection with the question of assumption of risk, to be hereafter con-
sidered. Whether the particular rope was defective seems to have been
clearly and definitely submitted to the jury, and they must have come
to the conclusion that it was defective, and that because of such de-
fect it stretched, slipped, or in some manner gave way under the weight
of the men who were working upon the scaffold. The question now
is whether there was any evidence reasonably tending to sustain this
conclusion of the jury.

The witness Tony Olson testified that the ropes furnished for use
in suspending the scaffold were brought to the building by Pike &
Cook; that he assisted in unloading them; that Levere, the foreman,
was present, and that "it was an inferior class of ropes for that pur-
pose; the ropes was all old ropes, short lengths, ropes that was unrav-
eled at the ends for about a foot at each end, and they varied in length
from I should say four feet to eight or ten feet in length, and from
half an inch to an inch and a half in thickness, the ropes." He says
that he called Levere's attention to the condition of the ropes, and that
Levere replied that they were very poor ropes for that work. The
carpenter refused to allow the painter to use certain good rope which
was about the building, because he had to use it for other purposes.

Anton Olson testified that no other ropes were furnished, that he as-
sisted in hoisting all the scaffolds used on the work, that he observed
the ropes used, and noticed that they "wore smooth every time the
swing beam had been swung—that is, the edges of the rope, of the
iron wore the rope smooth; that is, in the place where it had been
resting upon the iron—and that we had to turn the rope  *   *   *
a short distance, so as not to get this smooth place to rest upon the
iron again." They were the same ropes which he originally examined
when he helped to unload them.

Gilbert Anderson testified that he also observed the ropes with which
the staging from which Olson fell was hung. "The ropes which the
staging was hung with was short ends, old ropes, been used for years,
was worn all over, was opening up, and the splicing was opening up,
and they was in very bad condition." He observed all the ropes which
were furnished for the erection of the scaffolds, and, being asked as
to the character of the ropes, he replied: "It was ropes, smaller sizes,
between sizes from an inch and a half an inch to an inch and a half,

smaller and bigger sizes; some rope we have to tie two knots, and some one knot, according to make it long enough to support the hooks."

George Olson testified with reference to the rope which was on the west end of the swing beam, and which supported the scaffold from which the respondent fell: "The rope was made into a loop, tied into a loop, and pretty close to the ends, tied up pretty close, and the whole end of the rope was raveled out and untied. I think it was in a knot, square knot. Right in the end of the rope, it was all loosened up, so it made a knot I guess, about that big (indicating). Q. Now, describe the size of the rope and the character of it. A. Why the rope was about three-quarter inch or seven-eighth inch rope, and it was all frayed out—well, all around the rope—so it look pretty bad, and that is the reason why we jerked on that swing beam to see if it was going to break. Q. Did you observe anything else about the rope? A. Well, all I observed to that was it was an old rope, and it was full of lime marks and acid marks; that is all."

George Olson testified that he examined the rope on the west end of the particular staging, and that "it looked like a dead rope," by which he meant that "after a rope gets about so old, it is about next to rotten; it don't hold very much. * * * I mean a rope, after it gets about so old, weatherbeaten and laying out in the rain and snow and sun, why it gets—the fibers gets that—it easily wears smooth. When it is new, it is kind of gummy and if you take the rope, and kind of twist it that way and push it along, you can almost touch it together, so it will bulge out like one of these little rubber whistles the kids have, and it is easier to take and pull it apart; that is, to take and pull the manila apart, so it won't hang together very well. * * * Why the strength of the rope is nowheres near the strength of a new rope; that is, it don't take very much weight to pull a rope of that kind apart."

William Rick testified that he observed the ropes which were furnished for use in the erection of these stagings. "They were different lengths of rope. Some were in loops. They was old rope, and some of the strands were pretty well worn out, and it was all dead. There wasn't much life to it, like a new rope would have."

Some of this evidence related to all the ropes which were furnished

for use in erecting the various stagings; but other parts refer to the particular rope which was used for the purpose of suspending the staging, from which Olson fell. It is true that extracts from evidence, when disconnected from the cross-examination, may give an incorrect impression; but, after considering the whole of the evidence, we are satisfied that a case was made for the jury upon the issue as to the quality and sufficiency of the rope for the purpose for which it was to be, and was, used.

2. The jury were instructed that the plaintiff assumed the risks of working upon this scaffold, unless he was relieved therefrom by a promise on the part of the foreman to furnish a chain, instead of a rope. The instructions were proper, and fully protected the rights of the defendant. The only serious question was as to whether the foreman, Levere, who made the promise, was a vice principal, or a mere fellow servant. This question was submitted to the jury as one of fact, and was determined adversely to the defendant. Pike & Cook were doing an extensive business and had numerous jobs. Putney was their general painting superintendent; but there was evidence to justify the jury in finding that Levere was in charge of the painting work on this particular building. Pike was there about twice a week, and Putney was there occasionally. As to Levere's authority, Pike testified that Levere was foreman over the painters, and that "his duties were to see * * * that the men were suitable for the work, and that he was to see that they had what they needed, by telling me or Mr. Putney, when we were there, or telephoning to the office what was necessary to keep his department in working order." The question was for the jury.

3. The serious question in the case is whether the plaintiff produced evidence sufficient to justify the jury in finding that the motion of the scaffold was caused by the lengthening or slipping of the rope, which was passed around the rafter. The appellants earnestly contend that the jury were left to mere conjecture as to the real cause of the accident. It is immaterial whether the rope lengthened or slipped. If either occurred, and caused the dropping of the platform, plaintiff can recover, if the defendants were negligent in the matter of furnishing and using the particular rope. But it is argued that, even if there was a dropping or motion of the platform, it was not caused, or at least the

107 M.—27

plaintiff failed to show that it was caused, by the slipping or lengthening of the rope. It was necessary 'for the plaintiff to prove by competent evidence that the defendants were guilty of the particular negligence alleged in the complaint, and that such negligence was the approximate cause of the accident. The jury cannot properly be permitted to speculate and conjecture as to the cause of the accident, or draw inferences, unless there was some reasonable basis therefor in the evidence; that is, there must be something in the evidence which renders the conclusion of negligence more reasonable than any other conclusion, which would be consistent with the absence of negligence on the part of the defendants. Lehman v. Dwyer P. & H. Co., 104 Minn. 190, 116 N. W. 352, and cases there cited.

Where what occurred is explainable on different theories, there must be something in the evidence itself to reasonably suggest the conclusion that it was due to one theory rather than another. "Where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible, and for some of which he is not, it is not for the jury to guess between these half a dozen causes, and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony; and no mere sympathy for the unfortunate victim of the accident justifies any departure from settled rules of proof resting upon all plaintiffs." Patton v. Texas & P. Ry. Co., 179 U. S. 658, 21 Sup. Ct. 277, 45 L. Ed. 361; Binewicz v. Haglin, 103 Minn. 297, 115 N. W. 271, 15 L. R. A. (N. S.) 1096. There was direct evidence that there was some motion of the plank. If the evidence failed to show what caused such motion, and if the fact of the accident is consistent with either of various theories, any one of which would relieve the defendant from liability, the plaintiff should fail, as it was incumbent upon him to produce evidence reasonably tending to show that the accident was caused by the specifically alleged negligent acts or omissions of the defendants.

The appellants contend that all the evidence is consistent with theories which would relieve them from liability. For instance, it is said that

it is equally probable that Olson, in reaching over for his whitewashing pail, which was on the other plank, slipped off the end of his own plank, or tripped or stumbled against the upper end of the lower plank, which stuck up a little above the plank upon which he was standing, or he may have had a slight vertigo or dizziness in stooping over at that height from the ground, or the plank may have been slightly warped, which caused it to "wobble" when he stepped on the warped side, or a slight motion may have been caused by the sudden change of position by the plaintiff, or one of the men who were working in the immediate vicinity, or a slight slip or drop may have occurred in the wiring, by which one part of the scaffold was attached to the grill work. If either of these things occurred, and caused the accident, plaintiff could not recover; but we think the record contains evidence to justify the jury in coming to the conclusion that the approximate cause of the dropping of the scaffold was the slipping or lengthening of the rope, as claimed by the respondent. The evidence is not very conclusive; but the jury, under proper instructions, so found the facts, and the appellants have not convinced us that there was no evidence reasonably tending to sustain the finding.

The respondent testified positively that the plank on which he was standing dropped or moved in such a way as to throw him off his balance. He gave the following account of the way in which he was injured: "Q. What were you doing at the time of the accident? A. I bend myself down to dip the brush in the pail. Q. What happened then? A. It was a drop right under my feet. Q. What was it that dropped? A. The swing beam. Q. How far did it drop? A. I couldn't tell how far; maybe a quarter of an inch or half an inch. I couldn't tell. Q. What was the effect upon you of that drop? A. I lost my balance. Q. What did you do then? A. I was going to grab to that iron beam under the ceiling. I missed it."

One of the men who was working on the same scaffold testified to feeling the motion; but it does not clearly appear from his testimony that the motion occurred before Olson began to fall. Another workman, who was on the scaffold near the respondent, but on a different plank, testified that he did not feel the motion. The evidence of neither of these witnesses is very clear or conclusive; but, when taken as a whole, we think it is at least not inconsistent with the respond-

ent's account of the way in which the accident occurred. No one saw the rope slip or break; but when we remember the character of the rope, as described by the various witnesses, and the way in which it was attached to the inclined rafter, we cannot say, as a matter of law, that the jury had no basis in the evidence for reaching the conclusion that the accident was caused in the manner alleged.

4. Numerous errors are assigned upon rulings of the trial court, the refusal to give certain instructions, and the giving of certain instruc-, tions to the jury. We have given them all careful consideration, but do not feel that it is necessary to discuss them in detail. Some are technically erroneous, but none can have been sufficiently prejudicial to justify a reversal. The verdict is large, but not so large as to show passion and prejudice. The injuries were very serious, and concededly are of a permanent character. In view of the fact that the trial judge has declined to set aside the verdict upon the ground of excessiveness, we feel that we would not be justified in reducing the amount.

The order of the trial court is therefore affirmed.