MARTIN SULLIVAN, Respondent, v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY, a Corporation, Appellant.

(213 N. W. 841.)

**Master and servant — negligence — contributory negligence — question for jury.**

1. In an action for personal injuries alleged to have been sustained by the plaintiff, a section hand, while riding upon a gasoline speeder which ran into an open switch and was derailed, the evidence is examined, and it is held:

(a) That the questions of negligence and of contributory negligence were questions of fact for the determination of the jury.

(b) That the evidence fails to show that the accident was occasioned by the running of the speeder at a high rate of speed or that it resulted from the manner of its operation as acquiesced in by the plaintiff and, hence it appears that the risk of the injury in question was not assumed by the plaintiff.

**Master and servant — federal act — assumption of risk.**

2. Under the Federal Employers' Liability Act the employee does not assume the risk of an injury caused by the negligence of a fellow-servant.

---

Annotation.—(1) The question of negligence and contributory negligence ordinarily one for the jury, see annotation in 16 A.L.R. 1178; 33 A.L.R. 190; 20 R. C. L. 166; 3 R. C. L. 1040; 4 R. C. L. Supp. 1342; 5 R. C. L. Supp. 1085; 6 R. C. L. Supp. 1195.

(2) Abrogation of defense of assumption of risk by Federal Employers' Liability Act, see annotation in 47 L.R.A.(N.S.) 62; L.R.A.1915C, 69; 18 R. C. L. 831; 3 R. C. L. Supp. 856; 4 R. C. L. Supp. 1213.

55 N. Dak.—23.

**Damages — cause of injuries — question of fact — for jury.**

3. The evidence bearing upon the character and extent of the plaintiff's injuries is considered, and it is held to present a question of fact as to whether the plaintiff's condition was due to the injuries received or to a constitutional disease.

**Appeal and error — personal injuries — cross-examination — treatment for disease — not prejudicial error.**

4. Where, upon cross-examination, the plaintiff had been asked concerning treatment he had received from a doctor and concerning the disease for which he had been treated, the error, if any, in permitting him to state on redirect examination the diagnosis that had been rendered by the physician was not prejudicial.

**Evidence — discretion of trial court as to certain evidence.**

5. For reasons stated in the opinion, it is held that the discretion vested in the trial court to stop an investigation into unsavory facts short of an exploration into needless indecency was not abused in permitting a certain exhibition before the jury and that there was no error in further permitting demonstrations to be made showing the alleged physical results of an injury.

**Trial — special verdict — negligence.**

6. For reasons stated in the opinion, it is held that no error was committed in submitting to the jury for a special verdict questions requiring the jury to find the ultimate fact of negligence and the lack of contributory negligence. Negligence and contributory negligence are not questions of law or of fact, depending upon whether found in a special or a general verdict.

**Trial — special verdict — findings of facts judgment to court.**

7. Where questions are submitted for a special verdict in response to which the jury is requested to find the facts alone, leaving the judgment to the court, the verdict is valid, notwithstanding that the jury might have been able to determine the probable effect of their answers upon the judgment.

**Damages — verdict held excessive.**

8. The verdict of $20,000 is held excessive and it is reduced, with an option to the plaintiff to accept the remission or retry the cause.

Opinion filed April 27, 1927.

Appeal and Error, 4 C. J. § 2952 p. 969 n. 56. Damages, 17 C. J. § 361 p. 1058 n. 60; p. 1059 n. 64; § 408 p. 1095 n. 86. Evidence, 22 C. J. § 898 p. 788 n. 71, 72; p. 789 n. 80, 86, 87. Master and Servant, 39 C. J. § 797 p. 674 n. 19; p. 675 n. 20, 21; § 1356 p. 1176 n. 23; § 1398 p. 1211 n. 18; p. 1216 n. 33. Trial, 38 Cyc. p. 1909 n. 21; p. 1917 n. 87 New.

Appeal from the District Court of Ward County, *Lowe*, J.

Modified and affirmed.

*L. J. Palda, Jr., C. D. Aaker,* and *C. E. Brace (John E. Palmer* of counsel), for appellant.

The duty of guarding an individual against injury which the law imposes upon a railroad company, is no higher or greater than that which the individual owes to care for his own safety. Southern Ry. Co. v. Bailey (Va.) 67 S. E. 365, 28 L.R.A.(N.S.) 379.

When negligence is concurrent and operative at the time of the collision, and contributes to it, there can be no recovery. Dyerson v. Union P. R. Co. (Kan.) 83 Pac. 680, 7 L.R.A.(N.S.) 132.

No railway employee is justified in performing his dangerous work in a heedless, unobservant manner, and, if injured under such circumstances, no recovery can be had. Sours v. Great Northern R. Co. 84 Minn. 230, 87 N. W. 766.

A railroad section crew assumes the risks ordinarily incident to the performance of their duty. Everetts v. N. P. R. Co. 50 N. D. 894, 198 N. W. 685.

The employee may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them. C. R. I. & R. Ry. Co. v. Ward, 252 U. S. 18, 64 L. ed. 430.

One who enters the service of a railroad company assumes all the ordinary risks of such service. He assumes such risks as are ordinarily incident to the service, not merely such as are necessarily incident to the service he enters. Elliott, Railroads, 2d ed, § 1288.

A servant, by entering or continuing in the employment of a master without complaint, assumes the risks and dangers of the service which he knows and appreciates, and those which an ordinarily prudent person of his capacity and experience would have known and appreciated in his situation. Choctaw, O. & G. R. Co. v. McDade, 191 U. S. 64, 48 L. ed. 96, 24 Sup. Ct. Rep. 24.

A special verdict should, so far as practicable, be framed so as to secure an intelligent consideration, upon the evidence of the issues made by the pleadings, and controverted on the evidence, separately,

and a decision thereof without reference to the final result upon the rights of the parties. Mauch v. Hartford (Wis.) 87 N. W. 816.

It is not the province of a jury, in returning a special verdict in a personal injury action, to find that one or the other party was negligent. Alexandria v. Young, 20 Ind. App. 672, 51 N. E. 109.

While, generally negligence and proximate cause are questions for the jury, they become questions of law when the facts are undisputed and reasonable men in the exercise of reason and judgment can draw but one inference therefrom. Johnson v. Minneapolis, St. P. & S. M. R. Co. 54 N. D. 351, 209 N. W. 786.

*F. R. Sinkler* and *G. O. Brekke,* for respondent.

The common-law rule, which makes the negligence of a fellow servant a bar to a recovery, as the servant is deemed to have assumed such risk, is abolished by the act of Congress in the Federal Employers' Liability Act. Miller v. Minneapolis, St. P. & S. Ste. M. R. Co. 50 N. D. 206, 195 N. W. 33; Mondou v. New York Ry. Co. 223 U. S. 1, 38 L.R.A.(N.S.) 44; Seaboard Air Line R. Co. v. Horton, 233 U. S. 492, L.R.A.1915C, 1; Cherpeski v. Great Nor. R. Co. (Minn.) 150 N. W. 1091.

Contributory negligence involves the motion of some fault or breach of duty on the part of the employee; and since it is ordinarily his duty to take some precaution for his own safety when engaged in a hazardous occupation, contributory negligence is sometimes defined as a failure to use such care for his safety as ordinarily prudent employees in similar circumstances would use. Seaboard Air Line R. Co. v. Horton, 233 U. S. 492, L.R.A.1915C, 1.

A motion to strike out evidence received without objection is in the discretion of the court. Hogan v. Klabo, 13 N. D. 326; Kolka v. Jones, 6 N. D. 461; Kronk v. Wabash R. Co. (Iowa) 98 N. W. 884.

The objection that the question does not call for the best evidence must be made to the question itself, and it is too late to raise it by motion to strike out the answer. St. Anthony & D. Elev. Co. v. La Rue, 95 N. W. 292.

A motion to strike out evidence should be refused where it comprehends both admissible and inadmissible evidence and does not distinguish one from the other. Minn. St. Paul R. Co. v. Nester, 3 N. D. 480; Roeller v. Hall, 64 N. W. 550.

BIRDZELL, Ch. J.   This is an appeal from a judgment and from an order denying the defendant's motion for judgment non obstante or for a new trial in an action to recover damages for personal injuries. The action is brought under the Federal Employers' Liability Act. The facts are that in May, 1925, one of the defendant's work trains was engaged in unloading steel rails in the vicinity of Donnybrook, North Dakota.   On May 5th these operations were in progress west of this station.   At this time the plaintiff was a member of a section crew at Carpio, a station nine miles east of Donnybrook.   This section crew was engaged assisting in the unloading operations.   At approximately eight o'clock in the morning of May 5th the plaintiff, together with one Abrahamson, the section foreman, and two other men employed as section men, left Carpio on a gasoline speeder, going west to participate in the unloading operations west of Donnybrook.   The plaintiff was stationed upon the forward right side of the speeder, Abrahamson, the section foreman who ran the speeder, was stationed back of him and to the left.   The other two men were at the rear and facing east.   Before leaving Carpio the foreman had cautioned the men (whether in the presence of the plaintiff or not is in dispute) to look out for trains from behind.   After passing the depot in Donnybrook and while going at a rate of speed from fifteen to twenty miles per hour, the speeder upon which the section men were riding approached an open main line switch, where it was derailed and the plaintiff thrown in such manner as to receive certain injuries.   The switch had been left open by the crew of the work train as that train had pulled out from the siding and gone west sometime before.   The switch target was turned in such a manner as to indicate that the switch was open, but this was evidently unnoticed by the plaintiff and by the section foreman as the speeder approached.   The conductor of the work train accounts for the switch being left open by saying that the switch was in use, as his orders would require him to again back in on the siding to clear the main track for an approaching train before any other train would have occasion to use the main track at the point where the switch was located.

After the accident the plaintiff was immediately taken to Carpio where he received medical attention from Dr. McCartney.   There was an open wound several inches long near his left ankle and he was otherwise bruised and injured.   About three days afterward he was taken

to Minot, where he went to a hospital for further treatment under the care of Dr. McCannell. He remained at the hospital until May 25th, when Dr. McCannell discharged him and remitted him to the care of Dr. McCartney of Carpio.

The specifications of error present to this court for decision the questions of the assumption of the risk, of contributory negligence, of the sufficiency of the evidence as to the nature and results of the injury as bearing upon the amount of damages, of the propriety of certain rulings on evidence, including the exhibition of the plaintiff's person to the jury, and the manner of submitting the case for a special verdict.

The argument that the plaintiff assumed the risk and that he was contributorily negligent is based largely upon the premise that men employed in the capacity in which the plaintiff was employed, while engaged in going to and from work upon speeders supplied by the railroad company, are charged with responsibility for their own safety. It is said that the rules of the company governing the operation of railway trains upon the tracks are necessarily made with a view to the safe operation of trains and not with the view of rendering the track safe for the operation of speeders conveying employees; that the leaving of the switch open for the convenience of the crew of the work train in running into the clear under orders for the protection of other trains using the main track was not negligence as to the plaintiff because no duty was owing to him in that connection, and that any danger of running into an open switch in the manner described is a risk incident to the employment and necessarily assumed by the plaintiff. The argument in support of contributory negligence charges the plaintiff with lack of due care for his own safety in failing to observe the condition of the target or the switch and, hence, to avoid the accident.

The section crew with which the plaintiff was working at the time of the accident had been employed on the job in question for some days with the knowledge of the conductor who operated the work train. The rules of the company, which are in evidence, specifically require that main track switches must be kept locked when not in use; that they must be left in proper position after having been used, and that conductors are responsible for the position of the switches used by them and their train men, except where switch tenders are stationed. (Rule

104.)   The conductor testified that in cases where they were working they usually left a switch open if they were using it; that they were using this switch at the time in question; that he had never received any written instructions that he could leave switches open; that he first left the switch open about 7:45; that it was left open about two hours; that he had no recollection of having left that particular switch open before; that on other occasions the brakeman had closed it; that he told the brakeman not to close it on the morning in question and that was the only time he had ever told him not to close it; that the place where the men were working with the train while the switch was open was about a mile and a quarter or a mile and a half west; and that the handling of a switch in going in and out of a siding, while working in the manner described, is left to the judgment of the conductor.   In view of the distance that the work train went from the switch in question after going from the passing track on to the main track, of the requirement of the company's rule 104 with reference to keeping main line switches closed, of the length of time the switch would be left open before the work train would be required to back into the clear, and of the knowledge the conductor had that the section crew in question would have occasion to pass that way in coming to work on a speeder, we are of the opinion that the evidence presents an issue of fact on the question of negligence.   Thus, while an employee may be held to have assumed the ordinary risks of his employment, this assumption does not extend to acts of negligence on the part of other employees which are directly responsible for an injury.

The language of this court in Miller v. Minneapolis, St. P. & S. Ste. M. R. Co. 50 N. D. 206, 195 N. W. 33, at page 215 of the official report and page 36 of the Northwestern Report, is applicable here:

"And, of course, the plaintiff did not assume the risks of any injury caused by the negligence of a fellow servant, for while it is true the Federal Employers' Liability Act did not abolish the doctrine of assumption of risk (Seaboard Air Line R. Co. v. Moore, 228 U. S. 433, 57 L. ed. 907, 33 Sup. Ct. Rep. 580; Seaboard Air Line R. Co. v. Horton, 233 U. S. 492, 58 L. ed. 1062, L.R.A.1915C, 1, 34 Sup. Ct. Rep. 635, Ann. Cas. 1915B, 475, 8 N. C. C. A. 834), it did abolish the fellow servant rule, and imposes liability for an employee's injury,

'resulting in whole or in part from the negligence of any of the officers, agents or employees' on the carrier."

The evidence fails to show that the accident was caused by the running of the speeder at a high rate of speed or that it resulted from the manner of its operation as acquiesced in by the plaintiff. On the state of the record shown above we can not say that the plaintiff was not injured through the negligent act of an employee, the risk of which was not assumed.

On the question of contributory negligence, the evidence shows that there was a target situated some five feet to the right of the main track at the point where the switch was thrown open, the target being some eighteen inches in diameter and painted in such a way as to be conspicuous; that the position of the target as the speeder approached was such as to indicate that the switch was open. In addition to this there is evidence that it was the duty of the plaintiff to look ahead for dangers such as that which caused this accident. On the other hand, there is evidence that the rules for the operation of speeders were fully complied with in that the foreman was functioning as the forward lookout, while the other two section men and the plaintiff were acting under orders as rear lookouts or following directions to keep a lookout for lose bolts. It is only when the evidence is such that reasonable men must be driven to the conclusion that the plaintiff was not acting with reasonable care for his own safety and that his failure to do so was the cause of his injury, that the court is warranted in holding contributory negligence to be a bar to recovery: This rule is elementary and is so often declared that citation of authority is unnecessary. We are of the opinion that under the facts disclosed in this record, applying this test, the court is not warranted in holding that the plaintiff was guilty of contributory negligence.

Passing now to a consideration of the evidence bearing upon the extent of the plaintiff's injuries, the plaintiff testified to the injury to his left ankle, to a bruise or mark on the left hip, to an injury to his back and to his bladder. He further testified with reference to the treatment he received, both in Carpio and in the hospital in Minot, and that he had lost in weight during, approximately, the six months that had elapsed between the date of the injury and the date of the trial, some thirty pounds. He testified to experiencing pains in his back and

to headaches; that very soon after his injury he noticed that his bladder was so affected that he could not control the passage of urine. His left foot was bared in the presence of the jury and pressure applied to the ball of the foot in such a manner as to produce a trembling of the foot, called ankle clonus. There was evidence that the foot was turned in an unnatural position and the toes pointed upward at an unnatural angle; that he had not been able since being hurt to move around without crutches; and that he had been healthly and able to work steadily prior to his injury.

On cross-examination he testified that in February, 1925, he was packing ice and caught a cold; that while his throat was not sore he could not talk plainly; that Dr. McCartney had examined his throat and told him he was smoking too much; that when he was in the Army in 1918 he received treatment from a specialist in France; that he was treated a couple of times; that he was treated for what he claimed was a soft chancre at Verneul, France, by a specialist in venereal diseases; that he remained in the service some seven months after that, and was not further treated for venereal disease and was not confined in a hospital at any time. (These facts are mentioned here because they form some of the symptoms upon which the defendant relies to establish that the plaintiff's condition was due to a constitutional disease known as syphilis, rather than to the injuries received at the time of the accident, and because error is predicated upon certain further examination to which reference will later be made.)

Dr. Cameron testified that he had examined the plaintiff on three different occasions; that he had examined X-ray pictures that were taken of his spine and of his legs; that there was evidence of injury to the soft parts of the left ankle joint characterized by limitation of motion in the joint; also a very tender point under the fourth and fifth lumbar vertebræ of the spine; also a scar on his penis, which might have followed the application of acid to burn off a soft chancre; that there was "a so-called ankle clonus, a true ankle clonus," and an absence of the scrotal reflex; that the X-rays showed a healed fracture of the lower end of the tibia and a fracture involving the fourth and fifth lumbar vertebræ; that there was a very marked odor of urine on the patient; that the ankle clonus indicates a definite injury to the spinal cord; that there is a turning out of the foot and a limitation of

normal flexion; that the injury to the spinal cord, as indicated by the ankle clonus accompanied by the fracture in the spinal column, would cause impairment of physical power; that the fractures themselves, in his opinion, would incapacitate the patient to the point where he could not exert himself in any manner involving the spine; that a fracture of the spine of the character described is not infrequently associated with injury to the bladder function; that the plaintiff could bear his weight on his foot temporarily; that the bone injury, including the injury to the spine was permanent.

On cross-examination Dr. Cameron testified that upon examination of the X-ray pictures the fractures in the vertebræ are quite evident that the ankle clonus could not easily be acquired; that he had seen soft chancres in the position this scar was; that he could not say that in all probability this was a hard chancre; that the latter is usually of syphilitic origin; that ankle clonus might indicate syphilis; that involuntary loss of urine is another symptom and that an exaggerated knee jerk may or may not be present in syphilis; that the above symptoms constitute a group which are symptoms found in syphilis as well as in other conditions; that "in syphilis you may find anything;" that in view of the definite injury to the spine the presence of the symptoms which are also present in syphilis would not, in his opinion, indicate a syphilitic origin or cause without further evidence such as the Wasserman test; that the plaintiff has definite lesions in his spine and ankle, whether he has any syphilis or not. Referring back to the chancre scar, he testified that neither he nor anybody else could tell from the scar whether it had been caused by the removal of a hard or a soft chancre.

Dr. A. J. McCannell, called for the defendant, testified to seeing and treating the plaintiff at the hospital in Minot soon after the injuries. He described a large lacerated wound in the region of the left ankle. He stated that the plaintiff complained of some tenderness in the lower abdomen and that there were some abrasions on the left hip and limb. He testified that there was no interference with the normal functioning of the bladder; that the plaintiff made no complaint as to pains in his back and that there was no paralysis of the lower limbs or any part of the body that he had discovered; that he did not see the plaintiff from the time he left the hospital, about the

24th or 25th of May, until he examined him the week of the trial. There were present at the examination, besides Dr. McCannell and the plaintiff's attorney, a Mr. Shong, Doctors Knapp, Erenfeld and Peterson. He testified that the injury near the ankle was very well healed, and the motion of the foot was good, with probably a very slight restriction of the movement; that at times the smaller toes of the foot were drawn up and at other times they were down in a normal position; that they would go down at times when plaintiff's attention would be called to something else or when the other doctors would make tests upon other parts of his body by applying articles varying greatly in temperature; that there was no sign of loss of urine; that the fingers were brought down the spine looking for tender places but none were found; that there was a scar on the penis like that found in cases of hard chancre caused by syphilis. From knowledge of the history of the accident, treatment and from examination, he said the plaintiff had never suffered any fracture that would in any way incapacitate his back or spinal column. He thought there would have been symptoms of such an injury immediately after the accident. In response to a hypothetical question, in which there was postulated the chancre scar, exaggerated knee reflexes, signs of ankle clonus, incontinence of urine, lack of scrotal reflexes on the left side, a run down condition, loss of weight, temporary loss of speech by reason of difficulty of the throat, the doctor expressed the opinion that such symptoms were due to syphilis. The absence of paralysis and pain in the back and the presence of the other conditions described for the period of two or three weeks after the accident, in the doctor's opinion, eliminated any marked injury to the spine. He could not conceive of a fracture of the body of two vertebræ without the same being followed shortly or immediately after the injury by some signs indicating such an injury. In his opinion there was no permanent injury to the ankle and so far as the ankle was concerned, in his opinion, the plaintiff would not be prevented from walking if he desired.

On cross-examination he testified that, in his opinion, the plaintiff had syphilis; that he did not find any evidence of a fracture of the vertebræ; that he examined X-rays for the purpose of ascertaining whether or not there was a fracture; that he did not know how many X-rays had been taken but that he had examined some of them. Ankle

clonus is a nerve trouble that usually indicates some trouble in the spinal cord. "It indicates disease or injury to the spinal cord." The patient had exaggerated knee jerk; that exaggerated knee jerk is an indication of some injury higher up, usually in the brain. It does not indicate an injury to the spinal cord unless it be high up in the spinal tract, but was not certain as to the latter. He would not look for exaggerated knee jerk to follow or be caused by a fracture of the fourth or fifth lumbar vertebrae. They took a sample of blood from the plaintiff for the purpose of subjecting it to the Wasserman test. There was a hardening of the lymphatic glands in different parts of the body. This occurs in other diseases where there is a slow infection of almost any kind. Of the symptoms testified to, there is only one that might not be found in a patient who had never had syphilis, that is the scar on the penis. A soft chancre would not leave just the kind of scar that was found. The scar is caused by the destruction of the tissues covering the particular part through infection or burning. Cauterizing is a proper treatment for soft chancre and, following the cauterizing, a scar may be found. He would not profess to say whether the particular scar had been caused by the destructive effect of the infection or by the means used to destroy the infection.

There is much of the testimony of Dr. McCannell that we have not attempted to abstract, but we have stated the substance of that which bears upon the symptoms that he observed upon his examination of the plaintiff and his opinion drawn therefrom. The testimony of Doctors Knapp, Erenfeld, and Peterson is in a general way in accord with that of Dr. McCannell, except that Dr. Knapp did not see the X-ray pictures. Dr. Peterson testified that he would not say that the plaintiff had syphilis but "it looked suspicious of it." There was no positive report on the Wasserman test, but the doctors explained that the failure to get a positive reaction in applying the Wasserman test does not necessarily negative the existence of the disease.

It is impossible within an opinion of any reasonable length to abstract the expert testimony which covers some two hundred fifty pages in the transcript. Enough has been set forth, however, to show the bases for the different opinions expressed by the experts. We are satisfied from a careful reading of all the evidence, however, that it cannot be said to establish so overwhelmingly the plaintiff's condition to be

due to syphilis as to require overturning a finding by the jury in the plaintiff's favor upon the supposition that the plaintiff's condition is due to the injuries sustained at the time of the accident. However suspicious the case might be, the present symptoms do not, in our opinion, in the light of all the expert testimony, so clearly indicate syphilitic origin that a reasonable person could come to no other conclusion. It will be noticed that practically every symptom upon which the conclusion of syphilitic origin is based either rests upon disputed testimony or is consistent with another and contrary hypothesis which is supported by substantial evidence. The first symptom—for instance, the scar—is shown not to be an absolutely characteristic hard chancre scar, because not shown to be distinctively different from a scar resulting from a different character of infection or by ordinary treatment for it. Similarly, the condition of the reflexes and the ankle clonus are reasonably accounted for on the record by either a traumatic lesion or a syphilitic lesion, depending on the weight which the jury attaches to the testimony offered in support of each hypothesis. We are of the opinion that on this record the question as to whether the plaintiff's condition at the time of the trial was caused by the injury sustained or was due to a constitutional disease was for the jury.

Error is assigned upon the refusal of the trial court to grant the motion of the defendant to strike from the record the testimony of Dr. Cameron in regard to the vertebræ. It is contended that this testimony should have been stricken because it appeared to have been based upon an X-ray picture which was not introduced in evidence. It appears that when Dr. Cameron was on the stand, immediately after the qualifying questions were asked, he was asked if he had examined the X-rays that were taken of the plaintiff showing the spine and his legs. He was then permitted to state what he had discovered on the X-ray examination without any objection being made and he was also cross-examined with reference to the same matters and dismissed from the stand. The following day he was placed on the stand for further cross-examination and when he stated that his testimony regarding the fracture of the vertebræ depended largely upon the X-ray picture, the motion to strike the testimony was made. The court elicited from the witness the fact that he had the plates in his possession. Then the court denied the defendant's motion. There can be no error in this

for two reasons: First, it was obvious from the beginning that the witness was basing his testimony regarding this matter largely upon the X-ray pictures. Had the defendant desired to have them introduced in evidence, he should have made a seasonable objection to the witness giving secondary evidence as to what appeared in the pictures. Second, before the defendant's motion was denied it appeared that the witness had possession of the plates upon which his statements had been based. The defendant then had an opportunity to demand the plates and to place them in evidence as a part of the cross-examination but did not see fit to do so. There is a clear distinction between the question raised upon the defendant's motion and permitting the opinion of an expert to be given based upon facts which do not appear in the evidence as in Pyke v. Jamestown, 15 N. D. 157, 107 N. W. 359. Here the witness has merely used an X-ray picture for the purpose of ascertaining a fact and has been permitted, without objection, to state to the jury as a fact that which he ascertained from the picture. Thereafter the fact was in the case in so far as the testimony of the physician was credited by the jury. The doctor's statement as to what the picture showed was at least secondary evidence.

Error is likewise assigned upon the following:

"Q. You had some pals in the barracks in France? A. Yes.

"Q. They were not doctors, were they? A. Yes, sir.

"Q. You showed them this little sore on your penis?

"A. Yes, sir.

"Q. What did they say it was? A. A venereal wart.

"Q. You thought that correct? A. Yes, sir.

"Q. What did the physician that treated you say it was?

"A. He said that it was a soft chancre.

"Mr. Palda: I object to the last part of the answer as incompetent, irrelevant and immaterial, and hearsay. I have had no opportunity to object to it, Mr. Sinkler having sought to slide it in without giving an opportunity for objection.

"The Court: Overruled.

"Q. The only way in testifying to Mr. Palda in regard to—when he asked you about a soft chancre, did you testify from what a doctor told you over in France?

"Mr. Palda: Objected to as incompetent, irrelevant, immaterial, no foundation laid.

"The Court: Overruled.

"A. Yes, sir."

It is contended that prejudicial error was committed in permitting the witness to state what the physician in France had told him it was. The record further shows that the subject of the chancre was first introduced during the cross-examination of the plaintiff by the defendant's attorney. The circumstances of his treatment for the disorder while in the army were brought out to the extent of eliciting from the witness the fact that he had been treated for a venereal disease. He was asked if he had not received treatment for a hard chancre, to which he replied in the negative; also, if he had contracted syphilis while in France, to which he likewise replied in the negative. Upon being asked with reference to a syphilitic scar, he denied that it was syphilitic. Then he was asked "How long were you treated? A. A couple of times. . . . Q. And that was treatment for what, you claim? A. Soft chancre. Q. And who was the doctor that treated you? A. I think this—I think the doctor's name was R-e-b-i-g or R-a-b-i-c-k. Q. You don't know how it was spelled for sure? A. No. Q. Where was he located, this man Rabick? A. In France. Q. What town? A. Verneul, France. Q. And he was a specialist in venereal diseases, was he not? A. Yes, sir."

Having been asked substantially what he was treated for in France, and it having been made to appear that he was treated by a physician, this cross-examination practically places before the jury the diagnosis of the French doctor. In view of this fact it can hardly be said that it was prejudicial to permit the defendant to repeat upon re-direct examination the diagnosis of the physician.

It is further urged that error was committed in permitting the plaintiff to exhibit his person to the jury in a separate room for the purpose of having them view the scar in question. The scar, as will be noted above, had assumed some importance. There is considerable testimony not hereinabove referred to or abstracted, in which the matter is gone into with more or less minute detail. At least one doctor drew an outline of it which is an exhibit in the case. Of course, the scar

itself affords, the best evidence of its own appearance. It is real evidence. However much of indecency may be involved in the exhibition in the instant case, we are not prepared to say that it went beyond the legitimate bounds for placing before the jury the actual facts in the case. No person of the opposite sex was directly involved or interested in this case. The principal defense made with regard to the plaintiff's injuries naturally opened up an unsavory line of investigation. We are not prepared to say that the discretion to stop it short of an exploration into needless indecency was abused.

It is further urged that prejudicial error was committed in permitting the plaintiff, with the aid of his counsel, to demonstrate in the presence of the jury the alleged ankle clonus or the trembling of the foot when pressure was applied in a certain manner. We think there is little merit in this contention. The subject of ankle clonus was pretty well exhausted in the examination of the various physicians and the demonstration could have done little more than clarify the testimony.

The appellant contends that there was error in submitting the case to the jury for a special verdict. It is said that the questions were in such form that the answers would be in the nature of legal conclusions rather than findings of the facts in controversy; also, that, owing to the character of the questions, the jury would know the ultimate effect upon the judgment of their answers. The questions submitted called for categorical answers as to whether the defendant had been negligent in the operation of the speeder, in leaving the switch open and in leaving it open without a guard, and as to whether the plaintiff had been guilty of contributory negligence; also, whether the defendant's negligence, if found to have been negligent, was the proximate cause of the plaintiff's injuries. It is suggested that, instead of submitting the questions of negligence and contributory negligence for direct answers, a form of question submitted by the defendant should have been used. In this form the inquiry was whether due care had been used in the operation of the speeder, or whether there was on the part of the plaintiff a want of ordinary care. York v. General Utility Corp. 44 N. D. 51, 176 N. W. 352. We think the difference between the questions submitted and those requested to be submitted is purely formal. The term "negligence" is often used in common parlance, and its legal sig-

nificance may readily be brought home to the jury, as was done in the instant case, by reference to the fictitious standard of common sense and common prudence that would ordinarily be exercised by one in similar circumstances. When so explained it is as readily understood as the synonymous expression of lack of due care, the use of which would require explanation by reference to the same standard. In essence the questions are the same. The jury would find the ultimate fact in response to either question. We do not regard the inference of negligence from the facts disclosed by the record to be an inference of law but of fact to be found by the jury. Negligence and contributory negligence are not questions of law or of fact, depending upon whether found in a special or a general verdict.

With reference to the questions being in such form as to enable the jury to determine the effect of their answers, it would seem that in a case of this character it would be difficult to frame questions in response to which the jury are to find the ultimate facts without foreshadowing the effect of the answers. This is especially true if it be assumed that the jury possesses ordinary intelligence. Obviously, the questions submitted here are not open to the same objection as those considered in the case of Morrison v. Lee, 13 N. D. 591, 102 N. W. 223, where the jury was asked to determine whether or not the person was guilty of *such* contributory negligence *as would bar him from recovery,* and were further instructed upon the law of contributory negligence barring recovery and were asked to answer the question in the light of the instruction. Obviously, such procedure is at variance with the special verdict statute, under which jurors are requested to find the *facts alone,* leaving the judgment to the court.

The appellant contends that the judgment is excessive. It awards the plaintiff $20,000 damages. This contention, we think, is well founded. While the measure of damages in cases of this character must be left largely within the sound discretion of the jury, we are of the opinion that the amount awarded here goes beyond reasonable bounds. The judgment is, therefore, reduced to $12,000 and all costs, and, as so reduced, it is affirmed. The affirmance, however, will be on condition that the respondent file a remission of the excess in the district court within thirty days after the remittitur from this court is

filed in the office of the clerk; upon failure to comply with the condition, a new trial to be had with costs to abide the event.

NUESSLE, BURR, BURKE, and CHRISTIANSON, JJ., concur.