## PETERS *v.* HOCKLEY ET AL.

(53 P. (2d) 1059)

*John F. Reilly,* of Portland (Wilson & Reilly, of Portland, on the brief), for appellants.

*Paul R. Harris,* of Portland (Davis & Harris and Chas. W. Robison, all of Portland, on the brief), for respondent.

BEAN, J. The action grew out of a collision between two automobiles at an intersection at East Thirty-eighth and Knott streets in the city of Portland. On February 17, 1934, at about 10 o'clock p. m., plaintiff, the owner of one of the automobiles which was driven by her husband, was going south on East Thirty-eighth street, approaching Knott street, and the Hockley automobile, owned by C. C. Hockley and driven by C. C. Hockley, Jr., was going east on Knott street, approaching East Thirty-eighth street. Therefore the Hockley automobile was to the Peters' right.

The law in effect at the time gave the right of way to the automobile first entering the intersection, subject to the right of way being forfeited on account of excessive speed. Each driver claimed to have entered the intersection first. Plaintiff's husband claimed when his car was passing the north sidewalk line of Knott street, he looked to his right and saw a car on Knott street, from 100 to 125 feet west of the west curb line of East Thirty-eighth street. He says he was then traveling about 15 miles an hour; that he looked at the car but could not say whether it was going fast or slow, although he knew it was moving; that he then proceeded into the intersection and did not see the Hockley car until after the impact, and that he was approximately two-thirds of the way across the intersection when the accident occurred. He does not know, except from the marks he saw after the collision, just in what part of the intersection the collision oc-

curred; he thinks he was about eight feet south of the center. He did not see another car following the Hockley car. Plaintiff's testimony was much the same as her husband's. She says she looked as they entered the intersection and saw the Hockley car about half a block away; that she did not observe its speed; that she did not look at it again or see it again before the collision; that she did not see the actual collision, but felt it, and that she did not see the car following the Hockley car. Both Mr. and Mrs. Peters were badly shaken up, and Mrs. Peters was unconscious for a time after the collision.

From a careful reading of the testimony, we think it tended to show that the Peters' car was first to arrive at the intersection. Defendant's car was a 1925 Reo, and it is claimed is capable of going 45 miles an hour, or, at the most, 50.

Thirty-eighth street and Knott street are each 60 feet wide. The distance between the curbs is 28 feet on each street. The streets are substantially level, paved and no obstructions are claimed to have contributed to the accident. Peters claimed, when approaching the intersection, to have been traveling four or five feet east of the westerly curb of East Thirty-eighth street and to have continued in a straight course and to have been struck by the Hockley car after having passed the center of the intersection about eight feet.

The evidence tended to show that the Hockley car sideswiped the Peters car, which then jumped the southeast curb of the intersection and ran up on a banked lawn, where it came to rest, so that the rear end of the car was eight or ten feet from the sidewalk. The Hockley car turned over partly on the curb and partly on the street. Mr. Hockley, Jr., the driver of the Reo car, claimed that he was traveling at a speed of

20 to 25 miles an hour, entered the intersection first, started to cross it, expecting the Peters car to stop or slow down; when the latter did not do so he swung the car partially to the right, with the result that the two automobiles sideswiped.

Defendants predicate error upon the ruling of the court on the following incident, which occurred at the trial: Plaintiff claimed an injury to her right shoulder, causing her great pain, and to be permanently unable to raise her right arm. X-rays of the shoulder were negative. Dr. Charles R. McClure examined the plaintiff's shoulder for the defendants a few days before the trial. He testified that plaintiff experienced a lot of difficulty in getting her arm above the horizontal position and passing it back of her, that he then took hold of her arm and was able to raise it, although plaintiff winced and said it hurt. On cross-examination of this witness, the court, over defendants' objection, permitted plaintiff's counsel to require the doctor to demonstrate before the jury how he had raised her arm. The defendants submit this resulted practically in a physical combat, with plaintiff resisting the doctor's efforts to raise her arm, crying out with pain, or pretended pain, and bursting into tears. Dr. McClure stated that he found no physical obstacle to the arm being raised to a perpendicular position and had in fact at that time raised it with the cooperation of plaintiff, but that she winced and said it hurt. On cross-examination, which is the basis of this assignment, the following occurred:

"Q. And now her shoulder and arm, you claim the arm can go up? A. I claim I could put it up; she wouldn't put it up herself, and said she couldn't do it.

"Q. You could take by physical force and shove the arm up? A. Yes, sir.

"Q. Now, the patient says she couldn't raise it? A. Yes, sir.

"Q. Did you ever have that happen before in your practice? A. Yes, sir.

"Q. Where there could be no physical reason for a practically certain, apparent result? A. No, that is making it a little too strong, Mr. Robison.

"Q. Then change it to fit your particular experience. A. I could cite personal experiences; a few years ago I had a serious condition of my own shoulder, came from infection, and mine wouldn't go up all winter— wasn't due to accident.

"Q. Doctor, under the same situation, yours wouldn't go up, and you couldn't put it up? A. No, mine wouldn't go up and I couldn't put it up.

"Q. Could anybody else put it up? A. I wouldn't let them, no.

"Q. Let the lady stand up, and you show this jury just what you,—let me have your coat (the plaintiff stands up before the jury and removes coat). Now, Doctor, will you just come down here, and before the jury show just what the woman can do herself, and what is necessary—A. (Interrupting) Well, she can tell that without my being there.

"Q. You show the jury what you did, to satisfy yourself.

"Mr. Reilly: If the Court please, I object to this demonstration, it has only one purpose, that is perfectly obvious to Your Honor. The plaintiff herself has testified that the arm could be put up there, but she couldn't put it up. The Doctor has so testified. This demonstration has no purpose except to try to make an impression here,—create prejudice in the case. I certainly think it is highly prejudicial.

"Mr. Robison: If your Honor please—

"The Court: It is part of the cross-examination.

"Mr. Reilly: I grant you it is part of the cross-examination, Your Honor, but it serves no useful purpose in the case for the lady to wince here and show pain while the doctor is manipulating her arm. I don't

see what purpose that serves, the doctor does not say that she has not pain under those circumstances.

"The Court: He may go ahead.

"Q. (By Mr. Robison) Doctor, show the jury just how you examined that arm. (The Doctor descends from the witness stand and demonstrates before the jury the raising of the plaintiff's arm at which the plaintiff cries out.)

"The Witness: She is deliberately holding back to-day, in addition to what she did in my office; I had no difficulty then.

"Mr. Reilly: Your Honor sees the object of this, and the purpose of it. I say it is radically unfair to a doctor to have a demonstration sought to be made here under those circumstances.

"Mr. Davis: Your Honor, if there is anything unfair with Dr. McClure, I want to know where it is. I have had lots of experience with him.

"The Witness: Ditto.

"Mr. Reilly: We ask an exception, and that the jury be instructed to disregard that very nasty statement just made by counsel.

"Mr. Davis: I have got a right to answer that gentleman when he makes a proposition of that kind.

"Mr. Reilly: I ask that the jury be instructed—

"The Court: These controversies between the lawyers and the witness are something not evidence in the case. The jury will disregard it. Go ahead."

■ While the trial court may, in its discretion, permit a plaintiff in a personal injury case to exhibit a limb that has been injured, where there is no wound and no reason for inciting the sympathy of the jury, we think it was an abuse of discretion for the trial court to permit a demonstration or experiment of raising the plaintiff's arm and permitting the plaintiff to cry out in pain. The condition of plaintiff's arm and shoulder had all been testified to and both the plaintiff and Dr. McClure indicated that it would be painful for her to raise her arm, and counsel must have known that

for the doctor to raise plaintiff's arm it would give her pain and it would naturally be expected that plaintiff would cry out or complain of the pain.

Without suggesting that plaintiff was not acting in good faith, such a proceeding opens the door for simulation and has a tendency to arouse the sympathy of the jury for the plaintiff and possibly resentment against the defendant, and we think it was an abuse of discretion and error: 26 R. C. L. 1019; *Patterson v. Howe*, 102 Or. 275, 284 (202 P. 225); *Cass v. Pac. Mut. Life Ins. Co.*, (S. D.) 253 N. W. 626; *Meyer v. Johnson*, 224 Mo. App. 565 (30 S. W. (2d) 641); *Willis v. City of Browning*, 161 Mo. App. 461 (143 S. W. 516); *Butez v. Fonda, etc. R. Co.*, 20 Misc. 123 (45 N. Y. Supp. 808); *Stewart v. Weiner*, 108 Neb. 49 (187 N. W. 121); *Vance v. Monroe Drug Co.*, 149 Ill. App. 499; *Felsch v. Babb*, 72 Neb. 736 (101 N. W. 1011).

26 R. C. L. 1019, § 16, reads in part thus:

"But where there are no wounds, no injuries that can be seen by the jury, it is improper to permit the exhibition of plaintiff's person for the purpose of conducting experiments to prove that he will cry out with pain or that his muscles will grow rigid when his legs are manipulated in a certain manner."

*Patterson v. Howe*, supra, is an action for malpractice. There was exhibited to the jury, over defendant's objection, a number of small particles of bone which the plaintiff testified worked out from the wound in her jaw at irregular intervals, following the extraction of her teeth. While the case was not reversed upon this ground, Mr. Justice RAND stated, in effect, that the direct tendency of the exhibition of the particles of bone to the jury was to arouse sympathy for the plaintiff and possibly resentment against the

defendant, and the court frowned upon such practice. There was no opportunity in that case for the crying out on account of pain, and the case differs considerably from the one under consideration. We are cited no case exactly in point in this state.

In *Meyer v. Johnson*, supra, the act was performed by plaintiff's doctor. As a result we find the following language of the court:

"In the course of the trial, when a certain doctor was on the stand, the plaintiff's counsel asked that the doctor examine plaintiff there in the presence of the jury. This the court permitted to be done over the objection of the defendants. Plaintiff's back was bared and the doctor ran his hands and fingers up and down the spine of plaintiff, and plaintiff would give expressions of pain at certain times, and plaintiff also himself said he objected to standing there with no one assisting him. This was error and will necessitate a reversal of this judgment. Willis v. Browning, 161 Mo. App. 461, 143 S. W. 516; Madison Coal Co. v. Altmire, 215 Ky. 283, 284 S. W. 1068. The Willis case is cited and apparently approved by the supreme court in Boyer v. Missouri Pac. R. R., 293 S. W. 386, 388."

In *Willis v. City of Browning*, supra, we read:

"The court permitted plaintiff to exhibit her ankle to the jury as evidence of its condition, etc. This was proper. * * * But a demonstration was permitted after such exhibition. Plaintiff was allowed, over defendant's objection, to get up and show how she said she could walk with and without her crutches. * * * The maimed, the widow, and the orphan draw strongly enough on the hearts of jurymen without affirmative effort to arouse sympathy. Human nature needs no artificial aid in this respect. Would it be allowable to strike a sensitive wound, in order that the jury might hear the plaintiff scream with pain? What restraint would there be on opportunity for simulated evidence. * * *"

In *Cass v. Pac. Mut. Life Ins. Co.*, supra, an action on an accident and health policy, over defendant's objection the court permitted plaintiff's doctor to exhibit plaintiff's hand, wrists, ankles and knees to the jury. This was held to be proper, but the doctor manipulated the joints and of this the court said:

"But in this case the privilege was abused. While the doctor was manipulating these joints plaintiff winced as though with pain and exclaimed 'ouch' and 'it hurts', etc. This course of conduct has a natural tendency to appeal to the passion and sympathy of the jury and to lead to excessive verdicts; and in a case where the jury had the fixing of the amount of the verdict, we would not hesitate to reverse a judgment because of a demonstration like the one made in this case. We are expressing our disapproval of the course of conduct followed by plaintiff and his counsel in this case, so that a similar situation may not arise in another case."

In *Butez v. Fonda*, supra, an action for damages on account of injuries to a small child, an exhibit of the child's leg to the jury was made by counsel. The child was terrified and started to cry. We find the following language of the court:

"I am satisfied that the scene, as it actually took place, was calculated to produce emotions on the part of the jury, possibly swaying their judgment to tenderness for the child and likely to affect their judgment on doubtful questions in his favor. Of all this the plaintiff took the risk in persisting in the request to have the leg exhibited, and if the result produced an occasion interfering with the proper incidents of the trial, the responsibility must, to some extent, rest upon the plaintiff—so far, at least, as to compel him to stand the burden of another trial which may be free from all disturbing elements."

In *Stewart v. Weiner*, supra, we quote the following language from the opinion:

"Another feature of the case should be noticed, although no specific objection is made thereto. The plaintiff was permitted to shake hands with each of the jurors in the trial, to show the weakened grip in his injured hand. This is demonstrative evidence of a very doubtful character, and so easily susceptible of manipulation and deceit that such practice should not be encouraged. Possibly the plaintiff did give the jury a fair exposition of the relative strength of his wrists, but it afforded an opportunity for imposition in a manner that can not be met by other proof or by cross-examination."

From *Felsch v. Babb*, supra, we quote the following:

"It is a too well settled rule in this court to call for further discussion, that the plaintiff in an action for damages for personal injuries may be permitted to exhibit to the jury, if he can do so, the contusions and wounds of which they consist. Such is also, we think, the practice in most courts in this country. * * * But in Hatfield v. Railroad Co., 33 Minn. 130, 22 N. W. 176, 53 Am. Rep. 14, it was held that it was not error by the trial court to refuse to permit the plaintiff in such an action to walk across the court-room floor, in the presence of the jury, for the purpose of demonstrating the degree of her lameness. * * *"

The case of *Herter v. City of Detroit*, 245 Mich. 425 (222 N. W. 774), cited and relied upon by plaintiff, is out of harmony with the above cases cited. The court said:

"* * * During his examination the plaintiff was permitted to bare his arm, and the doctor explained to the jury the nature of the injury thereto. He testified that in moving both the shoulder and the elbow joint there was a sound 'much like an old fashioned coffee grinder', and illustrated this fact by the

use of plaintiff's arm. It is said that the plaintiff then made 'exclamations of pain' in the presence of the jury, and that error was committed thereby. The plaintiff had theretofore testified that he at times suffered pain. * * *"

The court found no error in this.

In *Sears v. Goldsmith*, 136 Or. 151 (298 P. 219), cited by plaintiff, the doctor merely measured the ankle of plaintiff to ascertain if one was larger than the other, on account of swelling. He did not recall noticing whether there was a swelling at the time he made the examination. It was merely an exhibition and not a demonstration.

The case of *Bowerman v. Columbia Gorge Motor Coach System, Inc.*, 132 Or. 106 (284 P. 579), relied upon by plaintiff, is where there was an exhibition of the eye socket to the jury. There was no demonstration or experiment in that case.

In *Sullivan v. M. St. P. & S. S. M. Ry. Co.*, 55 N. D. 353 (213 N. W. 841), plaintiff was permitted, with the aid of counsel, to show how his foot trembled when pressure was applied in a certain manner. There was no exclamation of pain or pretended pain. The matter had been thoroughly discussed in the evidence; the court held the demonstration could have little more effect than to clarify the testimony. As we understand, it depended upon the particular facts in that case.

Plaintiff cites several cases where there was an exhibition of the injured limb or part of the person, which differ from a demonstration or experiment. We think, according to the weight of authority, and upon reason, the demonstration or experiment was inadmissible. We do not expect to find uniformity of opinions on an important question.

■ The next assignment of error is predicated upon the court permitting plaintiff to testify in rebuttal to statements alleged to have been made to her by Dr. McClure, inconsistent with his testimony. Counsel for defendants objected on the ground that no foundation had been laid for impeachment of the doctor. The specific questions and answers were as follows:

"Q. And what did he say to you about the shoulder at that time?

"Mr. Reilly: That is objected to as an impeaching question without any foundation laid, and therefore hearsay.

"The Court: She may answer.

"Mr. Reilly: An exception.

"The Witness: He said that he had a shoulder just like it himself, and it bothered him for quite some time, and mine would too; that is what he told me."

Section 9-1912, Oregon Code 1930, provides in part that a witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places and persons present; and he shall be asked whether he has made such statements, and, if so, allowed to explain them. The admission of this testimony was a plain violation of this section, which declares the preexisting common-law rule.

It is contended on behalf of plaintiff that the doctor had testified to the same facts. From a comparison with his testimony, we find that while he mentioned his experience with his shoulder, he did not state that plaintiff's arm would bother her for "quite some time". The doctor should have had an opportunity to deny or explain the statement before the introduction of the impeaching testimony. It was, we think, unfair to the doctor and prejudicial to the defendant's case.

■ Dr. McClure was not an employee, servant or agent of the defendant. He was not authorized to make admissions out of court which would bind the defendants. He was simply a physician called as a witness by defendants, after having made a physical examination of plaintiff. It was not within his province to make statements for defendants in regard to the case. *Wemett v. Mount*, 134 Or. 305 (292 P. 93), cited by plaintiff as authority for admission of his testimony, was a different case. There the statement of the nurse, that she had forgotten all about the plaintiff, made at the time while the electric machine which the nurse had applied to plaintiff's body was actually burning plaintiff, was received in evidence in a malpractice case. The nurse was an employee of defendant, and her statement was part of the res gestae. We do not deem this case in point. It may be that the authority of a physician, in representing an insurance company at the time of the first examination for the issuance of a policy, is different from that of a physician as a witness in a personal injury case.

■ Defendant contends that the court erred in refusing to give defendants' requested instruction No. 11, as follows:

"I instruct you that it is the duty of a driver, before entering and while crossing an intersection, to keep a lookout for traffic, and especially for traffic to his right. A driver is not required to look exclusively to the right, but he is not justified in entering the intersection until he has performed that duty, and as he proceeds across the intersection he must give due attention to the traffic on his right. Applying this instruction to this case, if you find from the evidence that plaintiff's husband looked to the right before entering the intersection, but thereafter failed to give any further attention to the traffic coming

from his right, then he did not perform the duty commanded by law and was guilty of negligence.''

The trial court instructed on this phase of the case as follows:

''I instruct you that under the law the fact that a person has the right of way at an intersection does not justify him in driving through heedlessly if because of the proximity of another car and its speed, which he observes or should observe, there is danger of a collision. If, therefore, you find that the plaintiff's car had the right of way, but the Hockley car was so close to the intersection and proceeding at such a rate of speed that a collision was imminent, all of which plaintiff's husband saw, or should have seen, then plaintiff can not recover in this action.''

We think the instruction given was as fair to the defendant as could be reasonably required. In crossing a street intersection the driver of an automobile having the right of way, having looked to the right and seen an automobile approaching, and believing he had sufficient time to cross the intersection, is not contributorily negligent as a matter of law in failing to look again to the right. His actions at such times should be governed by those of a reasonable, prudent person under such circumstances: *Siskel v. Calhoun*, 147 Or. 606 (34 P. (2d) 659); *Stryker v. Hastie*, 131 Or. 282 (282 P. 1087); *Ellis v. Olson*, 139 Wash. 351 (246 P. 944).

We do not deem it necessary to comment on all the cases cited by the parties.

On account of the two errors mentioned above, the judgment of the circuit court must be reversed and the cause remanded for a new trial. It is so ordered.

CAMPBELL, C. J., and RAND and BAILEY, JJ. concur.