Argued December 7, 1977, reversed and remanded April 18, petition for
rehearing denied with opinion May 23, 1978
See 282 Or 411, 579 P2d 1287

WILSON, *Respondent,*
*v.*
PIPER AIRCRAFT CORPORATION, *Appellant.*
(TC 72 4267, SC 24703)

MacDONALD, *Respondent,*
*v.*
PIPER AIRCRAFT CORPORATION, *Appellant.*
(TC 72 4281, SC 24704)

577 P2d 1322

[ 62 ]

William B. Crow, Portland, argued the cause for appellant. With him on the briefs were Grant T. Anderson, Jeremiah A. Denton III, and Miller, Anderson, Nash, Yerke & Weiner, Portland.

Robert B. Hopkins and Martin Schedler, Portland, argued the cause for respondents. With them on the brief were David W. Harper, and Keane, Harper, Pearlman & Copeland, Portland.

HOLMAN, J.

Linde, J., concurring opinion.

**HOLMAN, J.**

These two products liability cases, consolidated for trial and appeal, are wrongful-death actions brought by the personal representatives of two passengers who died after the crash of a small airplane. The only defendant is Piper Aircraft Corporation, the manufacturer of the aircraft.

The airplane, a Piper Cherokee manufactured in 1966, took off from the Eugene airport on January 22, 1971, with a licensed student pilot at the controls and a qualified instructor in the copilot's seat. Plaintiffs' decedents, Douglas Wilson and Arbie MacDonald, were passengers in the two rear seats. The airplane crashed in the Cascade Mountains southeast of Oakridge, after entering a cloud. All four occupants of the plane survived the crash itself, but plaintiffs' decedents and the student pilot died at the crash site before rescuers arrived. The only survivor was the instructor, Terry Liittschwager, who, at the time of trial, had no memory of the events immediately prior to the crash.

Plaintiffs' theory was that the crash was caused by engine failure resulting from carburetor icing, and that the deaths of Douglas Wilson and Arbie MacDonald were caused in part by injuries resulting from certain design features in the rear passenger compartment. There was evidence to support both of these contentions. The jury returned substantial verdicts for both plaintiffs, and defendant appeals.

Plaintiffs alleged the defendant furnished an airplane which was dangerously defective in various particulars having to do with both the engine's susceptibility to icing and the crashworthiness of the rear passenger compartment. The assignments of error require us to consider both aspects of the case.

In support of their theory that the airplane was dangerously defective because of its susceptibility to icing, plaintiffs alleged the following design defects: (1) the aircraft was not equipped with an injection type

fuel system; (2) the carburetor was not so designed and equipped that it would provide a proper fuel-air mixture under icing conditions; (3) the aircraft was not supplied with an adequate carburetor heating system; and (4) the aircraft was not equipped with a carburetor heat gauge. Defendant contends first that these allegations, regardless of the state of the evidence, do not present a jury question; and second that the evidence was insufficient to justify submitting them to the jury.

In support of its first contention, defendant points out that it is undisputed that the design of this model of airplane was specifically approved by the Federal Aviation Administration (FAA) under its statutory authority to set safety standards for aircraft, and that this particular airplane had been issued an FAA certificate of airworthiness. It is defendant's position that the airplane's design could not be dangerously defective since it met the applicable FAA safety standards, and that FAA approval of the design has foreclosed any further inquiry into its adequacy from a safety standpoint.

■ We have found no support for this position. Neither the applicable statutes themselves, 49 USC § 1421-(a)(1) and 1423(a) and (c), nor the legislative history (see 1958 US Code Cong & Adm News 3741) indicates any Congressional intent to provide that FAA approval of either the general model design or the airworthiness of the particular craft is a complete defense to the claim of civil liability for faulty design. Indeed, 49 USC § 1421(a)(1) provides that the FAA design standards are minimum standards only.[1]

---

[1] "(a) The Administrator is empowered and it shall be his duty to promote safety of flight of civil aircraft in air commerce by prescribing and revising from time to time:

"(1) Such minimum standards governing the design, materials, workmanship, construction, and performance of aircraft, aircraft engines, and propellers as may be required in the interest of safety;

"* * * * *."

[ 64 ]

We have, in other contexts, refused to hold compliance with statutory or administrative safety standards to be conclusive on the question of tort liability where there is no evidence of a legislative intent that the standards are to be applied for that purpose. *McMullen v. Volkswagen of America,* 274 Or 83, 88-89, 545 P2d 117 (1976); *McEwen v. Ortho Pharmaceutical,* 270 Or 375, 397-98, 528 P2d 522 (1974). *See also Koch v. So. Pac. Transp. Co.,* 274 Or 499, 504, 547 P2d 589 (1976). *Cf. Lewis v. Baker,* 243 Or 317, 413 P2d 400 (1966). Other courts have treated compliance with the FAA safety standards as appropriate for consideration by the trier of fact in products liability cases involving aircraft. *See, e.g., Bruce v. Martin-Marietta Corp.,* 544 F2d 442, 446 (10th Cir 1976); *Banko v. Continental Motors Corporation,* 373 F2d 314, 315-16 (4th Cir 1966); *Berkebile v. Brantly Helicopter Corporation,* 219 Pa Super 479, 281 A2d 707, 710 (1971). We have found no cases holding that compliance is a complete defense. We hold that it is not.

■ That is not, however, the end of our consideration of the matter. The defendant also contends the evidence of these allegations was insufficient to be submitted to the jury for its consideration. This case presents difficult problems concerning the showing required of a plaintiff in a design defect case. There was evidence from which the jury could find that each of the allegations listed above accurately described the design of the aircraft, that the condition described in each allegation contributed to the likelihood of carburetor ice formation, and that the probable cause of the crash was engine failure caused by carburetor icing. We must consider whether this evidence was sufficient to permit the jury to find that the airplane was dangerously defective. We hold that it was not.

We have observed in prior products liability cases that charges of defective design present special problems. *Phillips v. Kimwood Machine Co.,* 269 Or 485, 525 P2d 1033 (1974); *Roach v. Kononen/Ford Motor*

*Co.,* 269 Or 457, 525 P2d 125 (1974). One of those special problems is the nature, and necessary proof, of a "defect" in a product which reaches the consumer in precisely the condition intended by the designer/manufacturer.

We have held that when a design feature of a manufactured product creates a risk of injury, the test for strict liability in tort, if that injury results, is whether "a reasonably prudent manufacturer would have so designed and sold the article in question had he known of the risk involved which injured plaintiff." *Phillips v. Kimwood Machine Co., supra* at 494. We discussed the question of reasonableness further in that opinion as follows:

> "To some it may seem that absolute liability has been imposed upon the manufacturer since it might be argued that no manufacturer could reasonably put into the stream of commerce an article which he realized might result in injury to a user. This is not the case, however. The manner of injury may be so fortuitous and the chances of injury occurring so remote that it is reasonable to sell the product despite the danger. In design cases the utility of the article may be so great, and the change of design necessary to alleviate the danger in question may so impair such utility, that it is reasonable to market the product as it is, even though the possibility of injury exists and was realized at the time of the sale. Again, the cost of the change necessary to alleviate the danger in design may be so great that the article would be priced out of the market and no one would buy it even though it was of high utility. Such an article is not dangerously defective despite its having inflicted injury." 269 Or at 495-96.

We are mindful of defendant's argument that a lay jury is not qualified to determine technical questions of aeronautical design, and of the forceful argument by Professor Henderson that problems of conscious product design choices are inherently unsuited to determination by courts. Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication,* 73 Colum L Rev 1531 (1973);

Henderson, *Design Defect Litigation Revisited,* 61 Cornell L Rev 541 (1976). We do not underestimate the difficulties involved in this type of litigation. We are, however, committed to the position that members of the public are entitled to compensation for their injuries if they are damaged because of improper product design. Actions for negligence would pose the identical difficulty because the evidence is similar. This is not a problem which is peculiar to products liability cases. In the absence of an ability to recover through courts, persons injured by such designs would be without a remedy.

We have never considered in detail the requirements of a plaintiff's prima facie case in this context, nor have we found decisions of other courts which have done so. We have, however, found suggestions in the reported decisions that the plaintiff's burden in a design defect case includes a showing that there was an available "alternative, safer design, practicable under the circumstances," *Huddell v. Levin,* 537 F2d 726, 737 (3d Cir 1976) (N J law), or that "in terms of cost, practicality and technological possibility, the alternative design was feasible," *Lolie v. Ohio Brass Company,* 502 F2d 741, 744 (7th Cir 1974) (Ill law); *see also Baker v. Chrysler Corporation,* 55 Cal App 3d 710, 127 Cal Rptr 745, 749 (1976); *McClellan v. Chicago Transit Authority,* 34 Ill App 3d 151, 340 NE2d 61, 63 (1975). *But see 141 South Main, Inc. v. Magic Fingers, Inc.,* 49 Ill App 3d 724, 7 Ill. Dec. 444, 364 NE2d 605, 608 (1977) (questioning whether technical feasibility is an essential part of plaintiff's case).

In *Roach v. Kononen/Ford Motor Co., supra,* 269 Or at 464, and *Phillips v. Kimwood Machine Co., supra,* 269 Or at 501, we said that the court should balance the utility of the risk against its magnitude in deciding whether to submit a design defect case to the jury. One of the factors to be weighed in making this determination is the manufacturer's ability to eliminate the unsafe character of the product without

impairing its usefulness or making it too expensive to maintain its utility. In other words, the court is to determine, and to weigh in the balance, whether the proposed alternative design has been shown to be practicable. The trial court should not permit an allegation of design defect to go to the jury unless there is sufficient evidence upon which to make this determination. If liability for alleged design defects is to "stop somewhere short of the freakish and the fantastic,"[2] plaintiffs' prima facie case of a defect must show more than the technical possibility of a safer design.

In some cases, because of the relatively uncomplicated nature of the product or the design feature in question, evidence of the dangerous nature of the design in question or of a safer alternative design may be sufficient to permit the court to consider this factor adequately. An extreme example is found in the facts of *Passwaters v. General Motors Corp.,* 454 F2d 1270 (8th Cir 1972). There a passenger on a motorcycle which was involved in a collision with an automobile was injured by purely ornamental blades on the automobile's hubcap. The evidence that the blades were ornamental only would suffice in such a case; the court and the jury could find from that fact alone that it would have been practicable to supply hubcaps of a safer design.[3]

---

[2] Prosser, *Palsgraf Revisited,* 52 Mich L Rev 1, 27 (1953), quoted in the design defect context in Raleigh, *The "State of the Art" in Product Liability: A New Look at an Old "Defense,"* 4 Ohio North L Rev 249, 264 (1977).

[3] In *Phillips v. Kimwood Machine Co.,* 269 Or 485, 501, 525 P2d 1033 (1974), we pointed out that the weighing of the magnitude of the risk against its utility, considering the factors listed there, is a task for the court in determining whether the case should be submitted to the jury. We further pointed out that the listed factors are not the bases for instructions to the jury. The jury is to be instructed in terms of what a reasonably prudent manufacturer would have done had he known of the harmful characteristics of the product. *Id.* at note 16. Nevertheless, the questions for the court and for the jury are related: the court must determine whether the utility of the risk so far outweighs its magnitude that a jury cannot be permitted to find that a reasonable manufacturer, with full knowledge of

■ Also by way of example, plaintiffs alleged in this case that the aircraft was not equipped with crashworthy shoulder harnesses and crashworthy seat belt brackets and attachments. There was evidence that workable shoulder harnesses and safer seat belt attachment designs were available when the airplane was manufactured. A court and jury could infer, on the basis of common knowledge, that the addition of shoulder harnesses and improved seat belt attachments would not significantly affect the over-all engineering of the airplane and would not be unduly expensive. (Defendant would, of course, be permitted to offer evidence to the contrary.)

■ In other instances, however, the question of practicability cannot be properly weighed solely on the basis of inference and common knowledge. That is the case with the allegations we are considering here. Plaintiffs' allegations amount to a contention that an airplane furnished with a standard aircraft engine is defective because an engine of a different type, or with a different carburetor system, would be safer in one particular. It is not proper to submit such allegations to the jury unless the court is satisfied that there is evidence from which the jury could find the suggested alternatives are not only technically feasible but also practicable in terms of cost and the over-all design and operation of the product. It is part of the required proof that a design feature is a "defect" to present such evidence. In at least some instances in the present case, that requirement has not been met.

We consider, because it well illustrates the problems involved, plaintiffs' contention that defendant's

the risk, would have withheld the product from the market. Evidence which is relevant to the court's weighing process will generally also be appropriate for the jury's consideration on the question whether the product is dangerously defective. *See Roach v. Kononen/Ford Motor Co.,* 269 Or 457, 464-65, 525 P2d 125 (1974). We speak here of what both the court and the jury could find, because evidence of practicability is appropriate for the jury's consideration in this context.

airplane was defective because it was provided with a carbureted engine rather than an engine with a fuel injection system. There was evidence that carbureted airplane engines are characteristically subject to icing of a kind which can result in engine failure and that fuel injected engines are not nearly so subject to dangerous icing. There was also evidence that, at the time this airplane was manufactured, fuel injected engines of appropriate horsepower were available, and expert testimony that FAA approval of an airplane like this one with a fuel injected engine could probably have been obtained.

There is not, however, any evidence about what effect the substitution of a fuel injected engine in this airplane design would have had upon the airplane's cost, economy of operation, maintenance requirements, over-all performance, or safety in respects other than susceptibility to icing. Plaintiffs' own expert witnesses testified that a carbureted engine of the type used in this airplane was, except for its susceptibility to icing, a highly satisfactory, dependable engine. There was also undisputed evidence that 80 to 90 per cent of all small airplanes comparable to this one are manufactured with carbureted engines rather than with fuel injected engines. There was no explanation of why this is the case.

We also think it is significant that both in 1966, when this airplane was manufactured, and at the present time the FAA safety standards disclose that the agency was aware of the carburetor icing problems and provided for them in its regulations and yet determined that the use of carbureted engines was not unduly dangerous.[4] Although we have held that compliance with the FAA safety standards does not preclude the possibility of liability for a design defect, we nevertheless believe that in a field as closely regulated as aircraft design and manufacture, it is proper to take into consideration, in determining

[4] 14 CFR §§ 23.1093 and 33.35 (1966 and 1977 revisions).

whether plaintiffs have produced sufficient evidence of defect to go to the jury, the fact that the regulatory agency has approved the very design of which they complain after considering the dangers involved.

■ Taking into account all of the evidence, including the FAA determination that this aircraft design included adequate protection against carburetor icing, we hold that plaintiffs did not produce sufficient evidence that a reasonably prudent manufacturer who was aware of the risks of carburetor icing would not have designed this model of aircraft with a carbureted engine, or that substitution of a fuel injected engine was practicable.[5] On this ground alone, defendant is entitled to a new trial.

Because the evidence at a new trial is not likely to be the same, we see no need to pass on the sufficiency of the evidence supporting the other allegations of defect involving the carburetor and carburetor heating system. The extent to which evidence of practicability is necessary as to such allegations will depend, in each instance, upon such factors as the complexity of the technical problems involved and the degree to which it appears that FAA approval of the design is relevant to the particular allegation of defect.

---

[5] As pointed out above, the court's task is to weigh the factors bearing on the utility and the magnitude of the risk and to determine whether, on balance, the case is a proper one for submission to the jury. In this case we focus on the practicability of a safer alternative design and hold that the evidence was insufficient to permit the trial judge to consider that factor. Our holding should not be interpreted as a requirement that this factor must in all cases weigh in plaintiff's favor before the case can be submitted to the jury. There might be cases in which the jury would be permitted to hold the defendant liable on account of a dangerous design feature even though no safer design was feasible (or there was no evidence of a safer practicable alternative). If, for example, the danger was relatively severe and the product had only limited utility, the court might properly conclude that the jury could find that a reasonable manufacturer would not have introduced such a product into the stream of commerce. We hold here only that, given the nature of the product and of the defects alleged, it was improper to submit the issue of a defect in the engine design to the jury in the absence of appropriate evidence that the safer alternative design was practicable.

■ As defendant is entitled to a new trial, we proceed to discuss those of the other assignments of error which involve matters likely to arise again. The first of these is defendant's contention that the trial court should have withdrawn from the jury the allegation that the airplane was dangerously defective because, although designed as a two-place airplane, it was sold as a four-place airplane. There was not much evidence on this question.

It is not disputed that the airplane was promoted and sold as having "true four-place capability." Plaintiffs' expert witness testifed that it was basically a two-place airplane. He further testified that the total weight of the airplane when loaded and its distribution are very important to its handling characteristics:

> "* * * To take an example of an airplane of this type, if you have two very heavy pilots flying the airplane from the front seat, there are very definite control forces needed to maneuver the airplane. It will actually tend it [sic] go a little slower perhaps. The stall characteristics of the airplane will be probably very good. If you put one very light pilot in the front and two heavy passengers in the back, but with the same total weight, the control forces become much lighter, so the pilot is much more apt to over control, the stall characteristics of the airplane become very much more exciting. You could get conceivably an uncontrollable situation, so to combat this the manufacturer and the FAA together will put limits on how far the balance point can be, a forward limit and an aft limit. So both the amount of the weight and its location in the airplane are important."

There is no indication, however, that this is not equally true for any four-place airplane.

The witness also testified that the instruction manuals furnished by defendant with the airplane were confusing and inconsistent as to weight limitations and the allowable back seat weight. By his computations, however, both the total weight and the center of gravity were within allowable limits during

the flight in question. As to the plane's carrying the four men during the flight, he testified:

"* * * Possibly the only contributing factor could have been the difficult handling qualities between a lightly loaded airplane and a heavily loaded airplane, which could have increased the pilot's work load to the point it would interfere with the rest of his duties."

Again, there is no evidence to indicate that an airplane with "true four-place capability" is not subject to similar problems when fully loaded. In any event, the likelihood that four occupants contributed to the accident would have to amount to more than a possibility.

Defendant's witnesses testified that the Piper Cherokee was originally designed as a two-place airplane and that modifications were later made to convert it to a four-place airplane. There was some evidence about what those modifications were but no evidence that they were inadequate to prepare the airplane to carry four passengers.

Separate allegations of defect as to the adequacy of the seats and the seat belt fittings in the rear compartment were supported by evidence and were properly submitted to the jury. This evidence would not justify the conclusion that the airplane did not have four-place capability in other respects. If the evidence is substantially the same on retrial, the allegation concerning lack of four-place capability should not be submitted to the jury.

Plaintiffs alleged that the aircraft was not equipped with crashworthy shoulder harnesses or with crashworthy seat belt brackets and attachments. The evidence showed that no shoulder harnesses were provided for the rear seat passengers and that the rear seat lap belt attachments had broken in the crash. One of the important issues in the case was whether the airplane was dangerously defective because of the type of lap belt assembly used and because of the failure to provide shoulder harnesses. In support of this theory,

plaintiffs called as a witness Dr. Snyder, an expert on aircraft occupant safety, who testified to the importance of shoulder harnesses as part of an adequate passenger restraint system and to the availability of such harnesses in 1966 when the airplane in this case was manufactured. In connection with Dr. Snyder's testimony, two motion pictures were shown to the jury. Both were admitted into evidence over defendant's objection, and the admission of each has been assigned as error.

■ The first film is a 20-minute documentary produced in 1954 by the National Advisory Committee for Aeronautics entitled, "Crash Impact Survival in Light Airplanes." It depicts a series of three test crashes of light two-place airplanes occupied by dummies. The film demonstrates the importance in a crash of upper torso restraints in addition to over-the-lap seat belts. It is accompanied by a sound track which includes, in addition to descriptions of the test crashes and their results, many general statements about the importance of shoulder harnesses in protecting the occupants of airplanes in crashes.[6] Defendant objected to admission of the film on hearsay grounds.

Plaintiffs argued, and the trial court concluded, that the film was admissible to illustrate Dr. Snyder's testimony. It was offered solely to illustrate general principles or concepts to which Dr. Snyder testified. There was no claim that the test crashes depicted in

---

[6]Some of these statements are:

"The motion pictures obtained verifies (sic) that most of the injuries that result from light airplane accidents are caused by the occupants striking part of the airplane inside the cockpit."

"The occupant can also be injured when he is improperly restrained and moves from his normal position to strike objects in the cockpit * * *."

"Even if the instrument panel is not pushed rearward, an improperly restrained occupant may hit it with his head * * *."

"* * * it is apparent that if injuries resulting from contact with solid structures are to be avoided when using only seat belts for restraint, a distance of about 45 inches ahead of the seat must be free of

the film were similar in speed, angle of impact, or other important conditions to the crash involved in this case. Although the jury was not instructed to consider only the general principles illustrated by the film, the record indicates that such an instruction would have been given if defendant had requested it. We have therefore disregarded, in our consideration of the admissibility of this film, all of the narrator's statements of fact about the precise conditions under which the tests were made as differentiated from his statements about the importance of shoulder harnesses.

Even so, we conclude that defendant's hearsay objection was well taken and that the film ought to have been excluded. During its viewing of the film the jury heard, from an apparently authoritative source, statements and conclusions which were directly relevant to a matter in issue (whether defendant's airplane was dangerously defective because no upper torso restraints had been provided for the rear seat passengers), and defendant had no opportunity to test the validity of those statements by examining the person or persons responsible for them. Dr. Snyder's familiarity with and willingness to be cross-examined about the principles involved did not cure this defect.

In *Kern v. Pullen,* 138 Or 222, 227, 6 P2d 224, 82 ALR 434 (1931), *overruled on other grounds in Fitze v.*

---

any solid objects. This much of a clear space is seldom available in an airplane. This dangerous movement is reduced to safe values only when the occupant is properly restrained by a seat belt and a shoulder harness."

"* * * Seat belts and harnesses capable of withstanding these dynamic loads [as measured in the test crashes] can be comfortable and light in weight."

"* * * Even if the structure remains intact, both seat belt and shoulder harness are necessary in cockpits if serious blows are to be avoided."

"It may be concluded, therefore, that the chances of surviving a crash are better if both a seat belt and a shoulder harness of proper design are used."

*American-Hawaiian SS.Co.,* 167 Or 439, 117 P2d 825 (1941), we recognized, as representing the weight of authority, the rule that in examination in chief

> " 'It is error to permit plaintiff to read to his medical witnesses [sic] * * * extracts from a standard work on surgery and then to ask them if what was so read correspond with their own judgment.' [Citations]."

Although we have had no occasion to apply that rule directly, we have never indicated any doubt that it was correct. *See, e.g., Eckleberry v. Kaiser Foundation et al,* 226 Or 616, 620, 359 P2d 1090 (1961); *Devine v. Southern Pacific Co.,* 207 Or 261, 275, 295 P2d 201 (1956).

The effect of showing this film was similar to the effect of permitting a witness to testify that he agrees with the opinions of absent experts whose statements are read into the record. Dr. Snyder's testimony was bolstered by corroboration by presumed experts, while only Dr. Snyder himself was available for defendant to cross-examine in order to test the authority and extent of that corroboration. The film, as narrated, was inadmissible.

The second film presents a different question. It was produced by the Federal Aviation Administration in 1967 while Dr. Snyder was employed by that agency. It was prepared by a team acting directly under Dr. Snyder's supervision, and although he did not personally participate in the making of the film, he testified that he reviewed and was familiar with the events it depicted and the results of the tests which it showed and described.

Plaintiffs contend that, under these circumstances, the film was not objectionable on hearsay grounds because of Dr. Snyder's availability for cross-examination. We do not pass on the merits of that contention because the character of the film itself was such that it ought not to have been shown to the jury. Entitled "Restraints for Survival," the film was obviously intended, and is undoubtedly very effective, as

an emotional as well as a factual appeal for the increased use of upper torso restraints for aircraft occupants. The facts and conclusions expressed by the narrator were emphasized in various ways, including the liberal use of dramatic music, repeated views of what appears to be a dead body beside the wreckage of a small airplane, and closeups of dummies used in test crashes, their faces smeared with red to simulate blood. Whatever its merits for other purposes, this film was totally out of place in this trial. Any probative value it had which was not merely cumulative of Dr. Snyder's testimony was outweighed by its frank appeal to the emotions of its audience.

We have held that when evidence is relevant but other considerations argue against its admission, the ruling on admissibility often lies within the trial court's discretion. A recent holding to this effect is *James v. Carnation Co.,* 278 Or 65, 562 P2d 1192 (1977). Such discretion, however, is not total or uncontrolled. For example, *compare Rich v. Cooper,* 234 Or 300, 311-12, 380 P2d 613 (1963) (party had a right, upon the record before this court, to have certain demonstrative evidence admitted) *with Peters v. Hockley,* 152 Or 434, 439-44, 53 P2d 1059, 103 ALR 1347 (1936) (abuse of discretion to permit demonstration of injuries which caused plaintiff to cry out in pain); and *Lampa v. Hakola,* 152 Or 626, 629-30, 55 P2d 13 (1936) (same). In the present case the features of the film which militate against its admission so far outweigh its probative value that its admission was not proper.

Prior to trial defendant moved for permission to amend its answer in order to allege, in mitigation of damages, the fact that Beverly MacDonald, the wife of one of the decedents, had remarried prior to trial. The trial court denied that motion and also ruled that evidence of Mrs. MacDonald's remarriage would not be admissible on the issue of damages. These rulings are

in accord with our holding in *Prauss v. Adamski,* 195 Or 1, 23, 244 P2d 598 (1952), where we said:

> "We are of the opinion that the fact of remarriage of decedent's widower has nothing whatever to do with the measure of damages. The loss sustained by the widower, as a beneficiary, is fixed as of the date of death. What may have transpired subsequent thereto is wholly immaterial."

*See also Raymond v. Southern Pacific Co.,* 259 Or 629, 637, 488 P2d 460 (1971). Defendant assigns these rulings as error and asks that we reconsider the rule adopted in *Prauss.*

Although the rule was adopted in that case without extended discussion, it is followed in all but two of the American jurisdictions which have considered the problem.[7] It may be true that the reasons given in support of that rule are not entirely satisfactory.[8] We have not, however, found any well-considered decision which rejects it.

Whatever the merits of the criticisms of the rule of *Prauss v. Adamski,* this is not a proper case in which to reconsider it. At the time Mrs. MacDonald's action was commenced, ORS 30.020 provided that damages in a wrongful death action were to be such as

> "* * * in all circumstances of the case, may be just, and will reasonably and fairly compensate the spouse, dependents or estate for the *actual pecuniary loss,* if any, to such spouse, dependents or estate * * *." (Emphasis added.)[9]

---

[7] See Annot., *Remarriage of Surviving Spouse, or Possibility Thereof, as Affecting Action for Wrongful Death of Deceased Spouse,* 87 ALR2d 252 (1963), and cases collected in Later Case Service. Defendant contends that we should follow the contrary rule because it prevails in England in cases brought under Lord Campbell's Act, from which American wrongful death statutes are derived. The English rule, however, has recently been changed by statute. Law Reform (Miscellaneous Provisions) Act 1971, § 4.

[8] *See, e.g., Comment, Remarriage and the Illinois Wrongful Death Act: The Effect of Changes in Status of Beneficiaries in Wrongful Death Actions,* 7 John Marshall J of Prac. and Proc. 395 (1974).

[9] The measure of damages in wrongful death actions was changed by the amendment of the statute in 1973. Oregon Laws 1973, ch 718, § 2. This case was tried under the statute as it read prior to the 1973 revision.

In this case, defendant sought to allege only the fact that Mrs. MacDonald had remarried, and its offer of proof consisted of that fact alone.

Where the ultimate fact to be proved is the actual pecuniary loss resulting from the death of a spouse, the mere fact of the surviving spouse's remarriage proves nothing. If that fact alone were known, the jury could only speculate about possible offsetting pecuniary benefits that might result from the remarriage. Defendant has not indicated that it could show any such benefits if permitted to do so.

A proper reconsideration of the rule involved here would require us to weigh the implications of permitting detailed inquiry into the pecuniary benefits to be expected from a new marriage. In the absence of any such evidence in this case, we decline to reconsider here our holding in *Prauss v. Adamski.*

There are other assignments of error, but the issues involved are not likely to arise in the same posture upon retrial so we do not discuss them. For the reasons given above, the judgment is reversed and the case is remanded for a new trial.

**LINDE, J.,** concurring.

While I join in the court's decision, the relationship between the allegedly defective design of the aircraft and the FAA's certification of that design perhaps deserves additional discussion.

Defendant contends that the approval of the design by a federal agency charged with responsibility for aircraft safety "preempts" any state law that would predicate liability on the production and sale of this aircraft type for use within the conditions for which it is certified. The contention blends two arguments: an argument based on federal supremacy, particularly with respect to equipment used in transportation across state lines, and another argument that the lawmaker has assigned the decision on the acceptable

safety of the design to someone other than common-law courts and juries.

The question of federal preemption is essentially one of statutory interpretation or, if one prefers, of Congressional "intent." *See Derenco, Inc. v. Benj. Franklin Fed. Sav. & Loan Ass'n,* 281 Or 533, 577 P2d 477 (1978). If Oregon undertook to declare that an aircraft type certificated by the Federal Aviation Administration is not safe enough to fly in Oregon and therefore prohibited such flights, this would present a serious issue of federal preemption.[1] But Oregon interposes no such prohibition against the operation of FAA-approved aircraft; it only imposes a certain measure of civil liability for injuries caused thereby. It might seem that exposure to potential civil liability of millions of dollars, under state rules which might even be closer to absolute liability than Oregon's, is a greater state-created obstacle to the federally approved operation than, for instance, a moderate fine would be, and we do not suppose that Congress could not also preempt such state rules of civil liability if it chose. But there is no reason to believe that it did so. In the rare case when Congress has considered the question, *e.g.,* in the Consumer Product Safety Act, it adopted a policy against preempting state laws on civil liability,[2] and we have been offered no evidence that it

---

[1] *Compare, e.g., Florida Lime & Avocado Growers, Inc. v. Paul,* 373 US 132 (1963); *Maurer v. Hamilton,* 309 US 598 (1940); *and Kelly v. Washington ex rel Foss Co.,* 302 US 1 (1937) *with Ray v. Atlantic Richfield Co.,* 46 USLW 4200 (1978); *Jones v. Rath Packing Co.,* 430 US 519 (1977); *and Napier v. Atlantic Coast Line R.R.,* 272 US 605 (1926). *Cf. Askew v. American Waterways Operators, Inc.,* 411 US 325 (1973) (state imposition of absolute liability for oilspill damage not preempted by federal act providing for recovery of federal cost of oilspill cleanup); *Huron Portland Cement Co. v. City of Detroit,* 362 US 440 (1960) (local air pollution regulations not preempted by federal safety inspection of ship boilers), in which the state objective differed from that entrusted to the federal agency.

[2] 15 USC § 2074 (1976). *See also* 15 USC § 1397(c) (1976) (discussed in *McMullen v. Volkswagen of America,* 274 Or 83, 88-89, 545 P2d 117 (1976)). The Consumer Product Safety Act excludes automobiles and aircraft from its coverage. *See* 15 USC § 2052 (1976).

intended a different policy under the Federal Aviation Act and its 1938 predecessor.

The second argument concerns the reexamination in a common-law trial of a determination first assigned to an expert agency, either by Congress or by the state legislature. This problem arises not from any federal or legislative "preemption" but from the particular nature and elements of the test for the aircraft manufacturer's civil liability for alleged design defects. In a state where common law or legislation imposed absolute liability on a producer for certain kinds of harm in fact caused by his product, the fact that it had been thoroughly tested and approved for safety would be immaterial. But when liability is predicated on finding a design "dangerously defective," not "duly safe," or short of some similarly phrased standard of safety, then a careful comparison of that standard and the one attested to by the certificate becomes important. Under such a test for civil liability, as well as under government regulation, the question, at least within the limits of the state of the art, is "how much safety is enough." But the factors that enter into the answer may or may not be the same.

It is true that compliance with government safety standards will generally not be held to negate a claim of "dangerously defective" design, but it would equally be an oversimplification to say that it can never do so. The role of such compliance should logically depend on whether the goal to be achieved by the particular government standards, the balance struck between safety and its costs, has been set higher or lower than that set by the rules governing the producer's civil liability. It may well be that when government intervenes in the product market to set safety standards, it often confines itself to demanding only minimum safeguards against the most flagrant hazards, well below the contemporary standards for civil liability. But that was not necessarily the case when the first

safety standards were legislated, and it is not necessarily so for all products today.

In the design of aircraft, government regulation obviously places a much greater weight on the side of safety than it does for most products. The FAA not only sets detailed performance standards for the operational aspects of the design, it also requires that the design be tested for compliance with these standards by the producer and ultimately by the agency itself before a certificate is issued.[3] This does not mean that an aircraft design, to be certified, must be the safest that could be built at any cost in money, speed, or carrying capacity. No doubt the FAA does not demand for small, single-engined recreational aircraft the redundant circuits and fail-safe systems expected in commercial airliners, not to mention the space program. It does mean, however, that FAA certification of a design represents a more deliberate, technically intensive program to set and control a given level of safety in priority to competing considerations than is true of many run-of-the-mill safety regulations.

The question remains how this policy assigned to the FAA compares with Oregon's standards of products liability for design defects. In two decisions in 1974, this court quoted a series of factors suggested by Professor Wade as posing the preliminary issue for a court whether a claim of "defect" crosses the legal threshold for submission to the jury.[4] The difficulty in the present case springs from the fact that most of these factors—briefly summarized, the safety risks,

---

[3] *See* 14 CFR §§ 21.11-21.53 (1977); *id.* pt. 23; Federal Aviation Administration, US Dep't of Transportation, Type Certification (Dec. 28, 1967) (No. 8110.4). For each type certificate issued, the FAA prepares a Type Inspection Report which contains the test results that establish compliance with the performance standards applicable to the type.

[4] *Roach v. Kononen/Ford Motor Co.,* 269 Or 457, 525 P2d 125 (1974); *Phillips v. Kimwood Machine Co.,* 269 Or 485, 525 P2d 1033 (1974). The factors were:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

the availability of safer design, the financial and other costs of the safer alternative, and the user's awareness of and ability to avoid the risks—are at least very similar to the factors that are presumably meant to enter into the FAA's judgment whether an aircraft design is safe enough.[5]

It must be kept in mind that this aircraft is alleged to be defective not because it fell short of the safety standards set for its type, but on the ground that these standards provide insufficient safety for the whole series. But once the common-law premise of liability is

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

269 Or at 464, quoting from Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss L J 825, 837-838 (1973). Since it is at least uncommon to test whether a sufficient case has been made to go to the jury by criteria different from those which the jury would be called upon to apply, it must be assumed that these factors are considered a more elaborate equivalent of the "prudent manufacturer" standard on which the jury is to be instructed. See *Phillips,* 269 Or at 499-500, and note 3 of the court's opinion in the present case.

[5] A final factor listed by Wade, but of no apparent concern to the FAA, is the producer's ability to spread the risk of injury from his product through its price, with or without liability insurance. As stated previously, if a state predicates a producer's civil liability on a theory of loss-spreading or "enterprise liability," then of course compliance even with the most demanding government safety standards will not relieve the producer of liability. But this court has in the past downplayed the loss-spreading capacity of an enterprise as a premise for tort liability. *See Phillips v. Kimwood Machine,* 269 Or 485, 503, 525 P2d 1033 (1974); *Wights v. Staff Jennings, Inc.,* 241 Or 301, 310, 405 P2d 624 (1965).

expressed as a balance of social utility so closely the same as the judgment made in administering safety legislation, it becomes very problematic to assume that one or a sequence of law courts and juries are to repeat that underlying social judgment de novo as each sees fit.[6] Rather, when the design of a product is subject not only to prescribed performance standards but to government supervised testing and specific approval or disapproval on safety grounds, no further balance whether the product design is "unreasonably dangerous" for its intended or foreseeable use under the conditions for which it is approved needs to be struck by a court or a jury *unless* one of two things can be shown: either that the standards of safety and utility assigned to the regulatory scheme are less inclusive or demanding than the premises of the law of products liability, or that the regulatory agency did not address the allegedly defective element of the design or in some way fell short of its assigned task.[7]

---

[6] Difficulties with "balancing" economic, social, and other factual elements in deciding a preliminary issue of law include the extent to which trial courts should accept evidence on the relevant factors or may act on judicial notice, the role of the record and the scope of review of those factual matters on appeal, and the possible result that the utilitarian balance may appear adequate to send the identical claim of defective design to the jury in one court and withhold it in another. Of course, we do not leave it to a jury to strike the balance de novo in a negligence case when the law itself has set a standard of conduct to guard against the risk at issue. *See, e.g., Stachniewicz v. Mar-Cam Corp.,* 259 Or 583, 488 P2d 436 (1971); *Blaine v. Ross Lumber Co.,* 224 Or 227, 355 P2d 461 (1960); *Stone v. Shaw Supply Co.,* 148 Or 416, 36 P2d 606 (1934); *Peterson v. Standard Oil Co.,* 55 Or 511, 106 P 337 (1910).

In an analogous determination of the "extrahazardous" character of an activity for purposes of strict liability, a judgment also sometimes described as a balance of utilitarian factors, we have followed the legislative judgment expressed in safety regulation without de novo trial of that issue. *Bella v. Aurora Air, Inc.,* 279 Or 13, 566 P2d 489 (1977).

[7] According to one study, this may have been the court's judgment in a case rejecting an FAA standard, *Berkebile v. Brantly Helicopter Corp.,* 219 Pa Super 479, 281 A2d 707 (1971), and in similar decisions rejecting reliance on compliance with the Federal Flammable Fabrics Act. *See* IV Interagency Task Force on Product Liability, Product Liability: Final Report of the Legal Study 134-136 (1977).

It is these two questions, rather than a de novo evaluation of the safety of a design and the technological feasibility and costs of an even safer alternative, that properly become the issues for preliminary determination by a trial court in deciding whether a "design defect" claim against a product specifically tested and approved under government safety regulations should nevertheless go to a jury. In other words, it should be defendant's burden to show that a governmental agency has undertaken the responsibility of making substantially the same judgment that the court would otherwise be called on to make; and if so, it should then be plaintiff's burden to show that the responsible agency has not in fact made that judgment with respect to the particular "defect" at issue. When the product has been tested and approved by a federal agency, these issues can normally be decided simply by examining the statutory assignment of the agency (including relevant legislative history), the further standards adopted by the agency itself, and the records and reports underlying its approval of the product. In the case of a state agency, the documentation may be less extensive but other evidence of the actual process may be more accessible to a state court.

With respect to the present case, the cited sources seem likely to show that the FAA's goals and standards match this court's criteria for a "duly safe" design, at least as far as an aircraft's airworthiness is concerned. *See* note 3 *supra.* It is not inconceivable that the answers might prove to come out one way with respect to FAA criteria and tests for aircraft engines and differently with respect to seat belts, or

---

When a defendant claims that government regulation precludes it from taking steps toward greater safety than the level set by the agency, we have placed the burden on the defendant to show this as a matter of justification or excuse. *Koch v. Southern Pac. Trans. Co.,* 274 Or 499, 547 P2d 589 (1976). *See also McEwen v. Ortho Pharmaceutical Corp.,* 270 Or 375, 398-400, 528 P2d 522 (1974) (defendant's reliance on FDA-mandated warnings failed under amended FDA regulations).

instrument knobs, or entry and exit steps, or other features whose risks are less central to airworthiness. Of course we do not know all that the parties might be able to show in this regard.

I repeat that this need to examine the precise standards and findings of the governing safety program results not from legislative preemption of common-law standards of liability, absent indications to that effect, but rather from these standards themselves when they are identical with those underlying the regulatory scheme. It may be that the tension between the policies embodied in intensive safety regulation and licensing and in case-by-case civil liability premised on "dangerously defective" design cannot remain unresolved, especially with respect to goods federally approved for a national market. A choice may have to be made between a theory of recovery premised on the need to compensate victims of product-caused injuries and one premised on liability for "faulty" products, no matter how attenuated the "fault" has become. Since 1976 this question has been one part of a larger study of product liability conducted by an interagency task force under the direction of the United States Department of Commerce, which also encompasses questions of liability insurance, improved preventive measures, and alternatives to present modes of compensating the victims of product-caused injuries. The final report of the task force, which contains suggestions for possible legislative action, became available early this year.[8] Meanwhile, given our present premises for "design defect"

---

[8]Interagency Task Force on Product Liability, Final Report ch VII (1978); I Interagency Task Force on Product Liability, *supra* note 7.

In a similar search for uniform products liability under separate legal systems in a common market, the Commission of the European Communities has recommended a directive to the member states to enact laws that would make producers liable for a "defective" product if the product "does not provide for persons or property the safety which a person is entitled to expect." Liability would cover, besides death and personal injury, damage to consumer property other than the defective article itself,

liability, I believe we must deal with cases involving products that have been tested and certified for safety according to the principles here stated.

and it could not be disclaimed. There would be special time limits and a maximum total liability for products having the same defect. These rules of liability, if enacted, would apply also to enterprises importing goods made outside the Common Market. *Product Liability,* Bull. European Communities, Nov. 1976 (Supp).